**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
(CHATTANOOGA)**

| | |
|---|---|
| IN RE: | ) |
| | ) **Chapter 11** |
| **LECTRUS CORPORATION,** | ) Case No. |
| | ) |
| **Debtor.** | ) |

**DECLARATION OF SHAUN M. MARTIN IN SUPPORT OF FIRST DAY MOTIONS**

I, Shaun M. Martin, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information and belief:

1. I am a Managing Member and one of the Founders of Winter Harbor LLC.

2. On December 7, 2017, Lectrus Corporation, a Tennessee corporation (the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Court").

3. The filing was duly authorized by the Debtor's Board of Directors.

4. Prior to the filing, the Debtor retained Winter Harbor LLC to examine its existing cost structure, stabilize operations, and preserve assets for the benefit of its creditors. Concurrently with the filing, the Debtor is seeking authorization to retain Winter Harbor LLC as Chief Restructuring Officer for the Debtor.

5. I submit this declaration in support of the "First Day" motions in the Debtor's above-captioned Chapter 11 case. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion, based upon my experience and knowledge of the Debtor's operations and financial

conditions. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this declaration describes the Debtor's business and the circumstances surrounding the filing of its Chapter 11 petition. Part II sets forth the relevant facts in support of the Debtor's First Day Motions filed concurrently herewith.

**I.  BACKGROUND**

    **A.  The Chapter 11 Filing**

7. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 7, 2017 (the "Petition Date").

8. The Debtor is operating its businesses and managing its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

9. No trustee or examiner has been appointed and no official committee of creditors has yet been established in the Debtor's bankruptcy case.

    **B.  General Business Background**

10. The Debtor is a Tennessee corporation founded as Metal Systems Inc. in 1968 in Chattanooga by James F. Steffner Jr. with 4 employees. The company was an offshoot of Electric Motor Sales Company and Chattanooga Armature Works, and was started in Chattanooga around 1890. In the beginning the company focused on building smaller electric enclosures for small businesses and later shifted to manufacturing large industrial enclosures.

11. Debtor provides three (3) tiers of products and services to its customers with fully engineered, integrated, and installed modular structures: modular structure design and fabrication, integration, and field services. The modular structures operation is focused on fabricating custom enclosures for project sites, including, steel skids, empty enclosures, and

enclosures with simple utilities. The integration operation is comprised of engineers and electricians which collaborate with the customer to install electrical or mechanical systems within the custom enclosure. Finally, the field service team offers site installation, pre-scheduled equipment maintenance, structural maintenance, and corrective maintenance for modular structures.

12. Debtor's customers, which among others, include Eaton Corporation, General Electric, ABB (a Swiss based company), Tennessee Valley Authority, Schneider and Siemens.

13. As of the Petition Date, the Debtor employed approximately 161 employees at its manufacturing facilities in Houston, Texas and Chattanooga, Tennessee. At the peak of its business the Debtor employed over 575 employees at its manufacturing facilities.

### C. Events Leading to Bankruptcy Filing

14. Changing demand within market sectors, increased competition and significantly lower margins have contributed to the current liquidity crisis facing the company.

15. In 2014, under the direction of the Debtor's former CEO, the Debtor changed its contractual terms and conditions, ceased marketing activities, shortened the warranty on its products and started requiring progress payments for a larger number of projects. Unfortunately, this coupled with a focus on operations, rather than on sales and customer interactions led to increased customer dissatisfaction and had a major negative impact on the Debtor's business. In 2013, the Debtor won new projects worth $76 million. In 2014 that number decreased to $56 million and by 2016 the amount of new projects won shrunk to $36 million. Year to date new project bookings are down to just under $20 million.

16. In recent weeks, the company has attempted to address the sales, operational and financial issues it faces. These steps include the retention of professionals to examine its existing

cost structure, stabilize operations, and preserve assets for the benefit of its creditors. Based on the information developed, the company concluded that it would be in the best interests of its various constituencies to commence this case in order to preserve its existing assets, and to investigate the viability of a restructuring, sale, or wind-down of its existing operations.

### D. Pre-Petition Indebtedness[1]

17. Prior to the commencement of these Chapter 11 cases, the Debtors were indebted, liable, and obligated to Great American Life Insurance Company, Great American Insurance Company, HD Special Situations II, LP, and HD Special Situations III, LP and any whole or partial successor or assign thereof (collectively, the "Pre-Petition Lenders") in the aggregate principal amount of $15,000,000.00 in respect of loans and advances (the "Pre-Petition Loans") made pursuant to that certain Note Purchase Agreement dated as of November 15, 2013, (as amended, restated and otherwise modified from time to time, the "Pre-Petition Note Purchase Agreement") by and between the Debtors and Great American Life Insurance Company, Great American Insurance Company, HD Special Situations II, LP, and HD Special Situations III, LP and any whole or partial successor or assign thereof (collectively, the "Pre-Petition Lenders").

18. The Pre-Petition Loans are secured by first priority, properly perfected liens and security interests, effective and valid in all respects, in all of the Debtors' real and personal

---

[1] Total Pre-Petition indebtedness amounts to $16,900,000. In connection with the original Note Purchase Agreement, the Debtor executed and delivered, in the aggregate principal amount of $15,000,000: (a) to Great American Life Insurance Company a 13% Senior Secured Term Note in the original principal amount of $5,500,000, (b) to Great American Insurance Company a 13% Senior Secured Term Note in the original principal amount of $2,000,000, (c) to HD Special Situations II a 13% Senior Secured Term Note in the original principal amount of $5,500,000, and (d) to HD Special Situations III a 13% Senior Secured Term Note in the original principal amount of $2,000,000. In connection with the Financing Agreement, the "Pre-Petition Lenders" lent the Debtor, the aggregate principal amount of $1,500,000. In connection with the Forbearance Agreement, the Debtor executed and delivered, in the aggregate principal amount of $400,000: (a) to Great American Life Insurance Company an 8% Senior Secured Term Note in the original principal amount of $150,000, (b) to Great American Insurance Company an 8% Senior Secured Term Note in the original principal amount of $50,000, and (c) to HD Special Situations III a 8% Senior Secured Term Note in the original principal amount of $200,000 (each as amended by an Amendment to Senior Secured Note effective as of February 2, 2015, and as further amended, amended and restated, supplemented, or otherwise modified from time to time, collectively, the "Pre-Petition Senior Notes").

property assets (the "Pre-Petition Collateral") granted and pledged pursuant to the following instruments and agreements (as amended, restated and otherwise modified from time to time, collectively, the "Pre-Petition Collateral Documents", and together with the Pre-Petition Note Purchase Agreement, the Pre-Petition Senior Notes and any and all documents executed in connection therewith and evidencing and governing the Pre-Petition Loan, the "Pre-Petition Loan Documents"): (A) that certain Security Agreement dated as of November 15, 2013 (as amended, restated and otherwise modified from time to time) by and among the Debtors and the Corporation Debtor (the "Pre-Petition Corporation Security Agreement"); and (B) that certain Owner Pledge and Security Agreement dated as of November 15, 2013 (as amended, restated and otherwise modified from time to time) by and among the Debtors and the Holding Debtor (the "Pre-Petition Holding Security Agreement").

19. On March 29, 2017, the Pre-Petition Lenders and the Debtors entered into that certain Financing Agreement whereby the Debtors requested, and the Pre-Petition Lenders agreed to provide the Debtors with, up to $1,500,000.00 in additional financing, pursuant to the terms and conditions of the Financing Agreement.

20. On November 7, 2017, the Pre-Petition Lenders and the Debtors entered into that certain Forbearance Agreement by which the Pre-Petition Lenders agreed to, among other things, forbear from exercising their rights under the Pre-Petition Loan Documents and agreed to provide the Debtors with $400,000.00 in additional financing. The Pre-Petition Lenders have not exercised their rights and remedies under the Pre-Petition Loan Documents as of the Petition Date. Instead, the Pre-Petition Lenders have supported the Debtors through this time. Specifically, the Pre-Petition Lenders have agreed to the use of their cash collateral and certain

of the Pre-Petition Lenders have agreed to provide post-Petition Date financing, subject to the terms and conditions of the DIP Financing Motion, as stated herein.[2]

## II. FIRST DAY MOTIONS AND APPLICATIONS

21. Soon after filing its Petition, the Debtor filed certain motions for expedited relief (the "First Day Motions").

22. The relief requested in the First Day Motions is necessary to facilitate continuation of Debtor's operations with little or no interruption. In my opinion, based on my experience in corporate restructuring and my knowledge of the Debtor's business, I believe that an expedited resolution of the issues raised in the First Day Motions is essential to the success of the Debtors' bankruptcy cases.

23. Specific factual information in support of each of the First Day Motions is provided below as well as in the various applications and motions.

### A. Statements and Schedules

24. The Debtor filed an Expedited Motion for Extension of Time to File Statements and Schedules.

25. The Debtor has limited employees to assist with compiling the information necessary for the Schedules and Statements of Financial Affairs. At the same time, the employees will have to continue the business of managing the day-to-day operations of the Debtor.

26. The Debtor would benefit from additional time to complete the statements and schedules. Such additional time would ensure a more accurate and complete filing and could alleviate the need for extensive corrections at some later point.

---

[2] As reflected in the DIP Financing Motion, Great American Life Insurance Company, Great American Insurance Company, and HD Special Situations III, LP have agreed to provide post-Petition Date financing subject to the terms and conditions of the DIP Financing Motion.

27. The Debtor anticipates being able to complete and file statements and schedules within 30 days of the Petition Date.

### B. Existing Bank Accounts, Forms and Cash Management System

28. The Debtor has filed a Motion for Expedited Entry of an Order Authorizing Maintenance and Use of Certain Existing Bank Accounts, Cash Management System, and Business Forms.

29. As of the Petition Date, the Debtor maintained all of its accounts with Regions Bank. The Debtor maintains an account with Regions Bank, used for operating receipts (the "Deposit Account"). The Debtor also has additional accounts for operating disbursements and payroll disbursements (the "Other Accounts"). Collectively, the "Operating Accounts" make up the Debtor's "Bank Accounts" that are the subject of its Motion.

30. Closing the existing Bank Accounts and opening new accounts would unnecessarily disrupt the Debtor's business and would not confer any benefit on third parties dealing with the Debtor. All parties in interest will benefit from preserving business continuity and avoiding the disruption and delay to the Debtor's business activities that would necessarily result from closing the Bank Accounts and opening new accounts.

31. The Debtor requests that the Court deem the Bank Accounts to be debtor-in-possession accounts and that the Court authorize their maintenance with the same account numbers, styles, and document forms as during the pre-petition period. The Debtor proposes that the Operating Accounts maintained with Regions Bank will constitute the primary debtor-in-possession accounts used in the Debtor's day-to-day operations.

32. To minimize expenses, the Debtor has also requested that the Court authorize it to continue to use its correspondence and business forms, including without limitation, purchase

orders, checks, letterhead, envelopes, and insurance and reimbursement forms, in substantially the same form existing immediately prior to the Petition Date, without reference to the Debtor's status as debtors-in-possession.

### C. Employee Wages and Benefits

33. The Debtor has filed an Expedited Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits, and Taxes and Request for Expedited Hearing.

34. The Debtor employs approximately 161 employees (collectively, the "Employees"). Such Employees include warehouse employees, main office employees, and production line employees. The Employees perform numerous functions that are critical to the Debtor's daily operations, including management, accounting, administration, inventory processing and production. The Employees' skills and knowledge are essential for the Debtor to continue operations.

35. These approximately 161 employees are paid weekly or bi-weekly. The next payroll, which was scheduled to be received by Employees on December 8, 2017, was funded on December 5, 2017, includes both weekly and bi-weekly employees. The weekly employees are paid one week in arrears and the bi-weekly employees are paid up through the date of the payment. The Debtor estimates that each weekly payroll to the employees totals approximately $130,000.00 and each weekly and bi-weekly payroll to the employees totals approximately $310,000.00 (plus applicable payroll taxes which are paid by the Debtor to the applicable payroll taxing authority).

36. The Debtor also offers employees paid leave and paid holidays ("Paid Time Off").

37. The Debtor is also obligated to maintain coverage for the Employees for workers compensation insurance.

38. As of the Petition Date the Debtor also had certain obligations for deductions from Employee paychecks for payments on behalf of the Employees for medical, dental and vision insurance coverage, a 401(k) retirement plan, loan repayments, garnishments or other support payments on account of which the Debtors deduct funds from Employees' pay and pay that amount to third parties.

39. The Debtor also pays state unemployment taxes to the states of Tennessee, Texas, Georgia, Alabama and North Carolina on a quarterly basis and it is anticipated that some obligations in this regard arose pre-petition. Finally, the Debtor withholds and pays the required federal employment withholding taxes.

40. As of the Petition Date, the Debtor has incurred debts to the Employees for (i) wages and (ii) other employee benefits, including, without limitation, those due to or for the benefit of the Employees under various health and other insurance plans or policies. The Debtors have also incurred debts with respect to the deductions and taxes discussed above, as well as limited employee expense reimbursements. All of these obligations are referred to collectively as the "Employee Expenses".

41. The Debtor seeks authority to pay the Employee Expenses. I believe that continued employment of the Employees is absolutely necessary to the Debtor's restructuring efforts. If the pre-petition Employee Expenses owed to and on behalf of the Employees are not paid, the Debtor's operations will be disrupted extensively.

42. Payment of the Employees will not prejudice other creditors in these proceedings. On the contrary, payment will contribute to the value of the Debtor's estate.

43. Emergency consideration of the Debtor's motion is necessary to avoid any disruption or delay in paying the Employee Expenses, which, as stated above, would greatly impair the Debtor's ability to successfully achieve its goals through Chapter 11.

### D. Utilities

44. The Debtor has filed an Expedited Motion Pursuant to Section 366 of the Bankruptcy Code for Interim and Final Orders: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices and (B) Determining that the Utilities are Adequately Assured of Future Payment.

45. The Debtor currently uses electric, gas, water, sewer, telephone, internet, cellular phone, and trash/garbage removal services provided by approximately 13 different utility service providers (the "Utility Companies"). The Debtor estimates that its average monthly payment to the Utility Companies totals approximately $52,700.00.

46. Utility services are essential to the ability of the Debtor to continue operations. Interruption of utility service to the Debtor would severely disrupt business.

47. The Utility Companies will not be prejudiced by the continuation of service to the Debtor because the Debtor proposes to provide adequate assurance deposits, if requested to do so by such entities.

### E. DIP Financing

48. The Debtor has filed an Expedited Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of the Bankruptcy Code (i) Authorizing the Debtor to (a) Obtain Post-Petition Secured Financing; (b) Utilize Cash Collateral; and (ii) Scheduling a Final Hearing.

49. The Debtor has an immediate need to obtain the post-petition financing in order to, among other things, fund its post-petition funding obligations including Debtor's normal business operations during the case and to fund the administrative costs of this case.

50. The Debtor's incurrence of the post-petition financing is, necessary to ensure that the Debtor has sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtor's estate and to avoid irreparable harm to the Debtor's estate and creditors.

51. The Debtor is unable to obtain financing from sources other than the post-petition lender and is unable to obtain adequate unsecured credit. The Debtor is also unable to obtain secured credit without granting the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims (each as defined in the Interim Financing Order), and the other adequate protection.

52. In sum, the Debtor believes that, given the realities of the current circumstances, the proposed DIP facility represents the best (and likely only) option available to address the Debtor's immediate liquidity needs. It is the product of extensive negotiations with the post-petition lender conducted in good faith and at arm's length.

### F. Insurance Premiums

53. The Debtor has filed an Expedited Motion for an Order Authorizing the Debtor to Pay Insurance Premiums.

54. By this motion, the Debtor proposes to continue to pay the premiums for the existing policies until the Debtor enters into any new agreement(s) and/or renewing the existing agreements in the ordinary course of business, without the need for further petition or approval of this Court.

55. The benefits of paying the premiums for the policies are clear. These policies are essential to the preservation of the Debtor's business, properties and assets, and in many cases, such insurance coverage is required by various regulations, law and contracts that govern the Debtor's business conduct.

56. In view of the importance of maintaining insurance coverage with respect to business activities, the Debtor believes that it would be in the best interests of the Debtor's estate and creditors to allow the Debtor to pay its insurance premiums.

57. Finally, the Debtor also proposes to pay any pre-petition premiums related to the coverages to the extent that the Debtor determines in its discretion that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the policies.

### G. Critical Vendors

58. The Debtor has filed an Emergency Motion for Order Authorizing the Debtor to Pay Pre-Petition Obligations Due to Certain Critical Vendors.

59. These Critical Vendors are necessary to the Debtor's operations and without them, the Debtor cannot conduct its business.

60. These Critical Vendors are companies for which the Debtor has no other alternative source for the goods and services these Critical Vendors provide.

61. As a result of the Debtor's liquidity crisis, the Debtor was not able to remain current on invoices from the Critical Vendors; as a result, the Critical Vendors ceased or will cease doing work for the Debtor.

62. While the Debtor will continue to attempt to negotiate with the Critical Vendors to continue working with the Debtor on the assurance that the Debtor will be able to compensate

them for post-petition work, the Debtor believes it is likely that the Critical Vendors will refuse to do business with the Debtor absent payment of their pre-petition claims.

### H. Retention of Debtor's Counsel

63. The Debtor has filed an Expedited Application for an Order Authorizing the Retention and Employment of Baker Donelson Bearman Caldwell & Berkowitz, PC as Counsel to Debtor.

64. Debtor seeks to retain Baker Donelson as its counsel both because of Baker Donelson's extensive experience in representing both privately held and publically traded businesses, in out-of-court restructurings and Chapter 11 bankruptcy proceedings around the country and because of Baker Donelson's knowledge of the business of Debtor, and its familiarity and practice in this Court.

65. Furthermore, in preparing for this case, Baker Donelson has become generally familiar with Debtor's current financial condition, business operations, and many of the issues that will be addressed in the case.

66. Accordingly, Debtor believes that Baker Donelson has the necessary experience and background to deal effectively with many of the potential legal issues and problems that may arise in the context of the case and that Baker Donelson is both well-qualified and able to represent Debtor in an efficient and effective manner.

67. The services of Baker Donelson are necessary to enable Debtor to execute the duties as debtor-in-possession and to develop, propose, and consummate a plan of reorganization and/or sale of the Debtor's business. Subject to further order of this Court, Baker Donelson will render the customary professional services provided by counsel to a Chapter 11 debtor.

68.     Baker Donelson has stated its desire and willingness to act in this case and render the necessary bankruptcy and reorganization services as counsel to Debtor. Debtor requires knowledgeable counsel to render these essential professional services. As noted above, Baker Donelson has substantial expertise in all these areas. As a result, Baker Donelson is well qualified to perform these services and represent Debtor's interests in this case.

69.     Baker Donelson represents no interests adverse to Debtor. Baker Donelson has been paid for its fees for all pre-petition work for Debtor, and is not a creditor of Debtor. Other than the matters disclosed in the Sveadas Declaration, Baker Donelson has no further connection with any of Debtor's creditors, the United States Trustee, or any other party with an actual or potential interest in this Case. Debtor believes that Baker Donelson is a "disinterested person," as defined in the Bankruptcy Code.

70.     Debtor submits that the employment of Baker Donelson would be in the best interest of Debtor, its estate, and creditors. The retention of Baker Donelson is also a pre-requisite for the Debtor to obtain the necessary DIP financing.

**I.     Retention of CRO**

71.     The Debtor has filed an Expedited Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing and Approving Debtor's (i) Retention and Employment of Winter Harbor LLC and (ii) Employment of Shaun Martin as Chief Restructuring Officer, Nunc Pro Tunc to the Petition Date.

72.     The Debtor has determined that it is in the best interests of the Estate to retain an independent Chief Restructuring Officer for the Debtor.

73. The Debtor believes that the employment of the CRO Candidate will enhance the Debtor's ability to develop a plan of reorganization, to explore possible exit financing options, and with the expertise of the CRO Candidate further improve the Debtor's operations.

74. The Debtor has used its business judgment to determine that retaining a CRO Candidate will benefit the Debtor and its Estate while at the same time fulfilling the policy of Chapter 11 of the Bankruptcy Code to allow the Debtor the chance, as debtors-in-possession, to control their own reorganization process.

75. The CRO Candidate has significant experience in turnaround management with experience and expertise in all facets of corporate financial and restructuring practice, including complex corporate reorganization.

76. To the best of Debtor's knowledge, the CRO Candidate is a "disinterested person" as that term is defined in the Bankruptcy Code.

77. To the best of the Debtor's knowledge, the CRO Candidate does not hold or represent an interest adverse to the Debtor or its estate, has no connection with the Debtor, creditors of the Debtor, or any other party with an actual or potential interest in this chapter 11 case, is not a creditor, equity security holder, or insider of Debtor.

78. The Debtor submits that its retention of the CRO Candidate would be in the best interest of the Debtor, its estate, and creditors.

### J. Interim Compensation

79. The Debtor has filed an Expedited Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Counsel for Debtor and Other Professionals.

80.     The Debtor requests that the Court establish procedures, comparable to those established in other Chapter 11 cases, for compensating and reimbursing Debtor's counsel on a monthly basis.  Such procedures will permit the Court and all other parties to more effectively monitor the fees incurred.

81.     Briefly stated, the requested procedures would require Debtor's counsel to present to the Debtor, the United States Trustee, and any official committee appointed in this case, a detailed statement of services rendered and expenses incurred for the prior month.  If no party timely objects to such statements, the Debtor would be authorized to pay Debtor's counsel the amount of fees and expenses incurred for the month.  These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process, approximately every 120 days.

82.     By permitting monthly payment of professional fees the proposed payment procedures eliminate the prospect that there could be either an extraordinary outlay of expenses or the exceptional delay in the payment of fees during a bankruptcy proceeding.

83.     The proposed procedures will enable the Debtor and parties in interest to closely monitor the cost of administration of this bankruptcy case, maintain a level cash flow, and implement efficient cash management procedures.  Moreover, these procedures will also allow the Court and the key parties-in-interest to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures on an ongoing basis.

**K.  Notices**

84.     The Debtor has filed an Expedited Motion for Order Establishing Notice, Administrative and Case Management Procedures.

85. By this Motion, the Debtor requests, the entry of an order limiting the notice procedures in this Chapter 11 case and designating parties who must receive notice of certain matters.

86. The Debtor submits that approval of the Notice Procedures is in the best interests of the Debtor, its estate, and its creditors. There are hundreds of creditors and parties-in-interest involved in the Debtor's case. The costs associated with copying, mailing or otherwise serving all notices and motions on these parties would impose an expensive administrative and economic burden on the Debtor's estate. Such mass mailings would be extraordinarily costly to the Debtor's estate and would require the Debtor to divert significant resources to comply with the administrative requirements.

87. The Debtor believes that adopting the Notice procedures will substantially reduce administrative burdens and result in substantial cost savings to the Debtor's estate because of the reduction of time and money the Debtor will have to expend on the filings. The Debtor further believes that adopting the Notice Procedures will also significantly reduce the administrative and economic burden placed on creditors and parties-in-interests when they elect to file a filing.

88. Pursuant to the terms of the Notice Procedures, all parties-in-interest that may be directly affected by the relief sought by a particular filing will receive notice of such filing directly from the party submitting the Filing to the Court. Thus, no party will be adversely affected. As such, the Debtor believes that that the Notice Procedures are appropriate and should be approved and implemented in this case.

89. Further, all parties in this case who are registered participants in the Court's CM/ECF system will receive a "Notice of Electronic Filing" via electronic mail whenever a Filing is effected, which will provide additional notice to such parties.

90. The establishment of the Notice Procedures will promote the efficient and orderly administration of the Debtor's Chapter 11 case and will result in a significant reduction in cost to the Debtor's estate and other serving parties.

91. Further declarant says not.

/s/ _____