**SO ORDERED.**
**SIGNED this 20th day of March, 2018**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

*Nicholas W. Whittenburg*
**Nicholas W. Whittenburg**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TENNESSEE
## (CHATTANOOGA)

| | |
|---|---|
| **IN RE:**<br><br>**LECTRUS CORPORATION, et al.,**<br><br>        **Debtors.** | **Jointly Administered Under**<br>**Case No. 1:17-bk-15588-NWW**<br><br>**Chapter 11** |

**ORDER AUTHORIZING: (I) THE SALE OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES,
PURSUANT TO THE TERMS OF THE ASSET PURCHASE AGREEMENT AND
SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE; AND (II) THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE**

THIS MATTER came before the Court on the *Motion for Order (A) Establishing Bid and Sale Procedures, and (B) Approving Sales of Assets Free and Clear of Liens, Claims and Encumbrances* (Docket No. 83) (the "Sale Motion") filed by the above-captioned debtors (collectively, the "Debtors") seeking authority, among other things, to sell substantially all assets of the Debtors, the Court having entered its *Order Establishing Bid and Sale Procedures* (Docket No. 145), as amended by that certain *Order Granting Debtors' Expedited Motion to Effect Clarifying Amendments to Order Granting Motion to Establish Bid and Sale Procedures* (Docket

No. 234) (collectively, the "Bidding Procedures Order"), AZZ Enclosure Systems – Chattanooga

LLC ("AZZ" or "Purchaser") having submitted the highest and best offer for the Debtor's

Chattanooga Assets pursuant to the procedures established in the Bidding Procedures Order (the

"Bidding Procedures" and the process for implementing the Bidding Procedures, the "Bidding

Process") and having been designated the Successful Bidder at the Sale Hearing (defined below);

the Court having reviewed: (a) the Sale Motion, (b) the Asset Purchase Agreement, dated as of

March 19, 2018 between AZZ and Lectrus Corporation (as it may be amended or supplemented

and together with all attachments thereto, the "Purchase Agreement") a copy of which is attached

hereto as **Exhibit A**,  (c) all other papers filed with the Court relating thereto, and (d) the

objections to the sale and the cure objections of certain contract parties, if any (collectively, the

"Objections") and; the Court having considered the statements of counsel with respect to the

relief granted herein and the evidence adduced at a hearing conducted on March 8, 2018 (the

"Sale Hearing"); and the Court having determined that the legal and factual bases set forth in the

Sale Motion and the other papers filed by the Debtors and at the Sale Hearing establish just cause

to grant the relief granted herein;[1]

      **NOW, THEREFORE,** it is hereby found and determined that:

<u>**Jurisdiction, Venue and Final Order**</u>

      A.    This Court has jurisdiction and authority to hear and determine the request to

approve the Sale and grant the other relief set forth herein pursuant to 28 U.S.C. §§ 1334 and

157(b)(2)(A), (N) and (O). Venue of these cases in this District is proper under 28 U.S.C. §§

1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 363 and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the Purchase Agreement, as applicable.

365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, and all other applicable law.

B.    This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

### Purchased Assets

C.    AZZ has executed the Purchase Agreement. The Purchase Agreement provides for, among other things, AZZ to purchase certain assets of the Debtors which are set forth in the Purchase Agreement (the "Purchased Assets").

### Notice of Sale Hearing, Purchase Agreement, and Cure Costs

D.    As evidenced by the certificates of service filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, the relief granted herein and the Sale Hearing has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code; Bankruptcy Rules 2002, 6004, 9006, 9007, 9008 and 9014; and the Bidding Procedures Order. Such notice was good and sufficient, and appropriate under the circumstances. No other or further notice of the Sale Motion, the relief granted herein, the Sale Hearing or the entry of this Sale Order is necessary or shall be required. To the extent that the amount of notice given to any party entitled to notice is less than the number of days required under the applicable rules, the notice actually given to any such party is hereby deemed to be sufficient and adequate by the Court, and the notice to any and all such parties is hereby ordered to be shortened to the notice actually given.

E.    The Debtors filed the notice of assumption and assignment with respect to the Sale as evidenced by the *Notice of (A) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and (B) Cure Amounts* (Docket No. 171) (as amended or supplemented,

the "Cure Notice") identifying (among other things) the costs required to cure defaults under the Assumed Contracts (as defined herein) pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). The Debtors served the Cure Notice on each of the non-debtor counterparties to the Assumed Contracts as set forth in the certificate of service attached to the Cure Notice. The service of the Cure Notice was sufficient under the circumstances and no further notice needs to be provided in respect of the assumption and assignment of the Assumed Contracts or the proposed Cure Costs related thereto, if any. Non-debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to the assignment and assumption of the Assumed Contracts and the associated Cure Costs.

**Marketing Process**

F.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors and their professionals, agents and other representatives have complied in all respects with the Bidding Procedures Order. Under the circumstances, the Debtors and their professionals, agents and other representatives have adequately and appropriately marketed the Purchased Assets. The Bidding Procedures were duly noticed and conducted in a diligent, non-collusive, fair and good faith manner, and the Bidding Procedures afforded a full, fair and reasonable opportunity for any person or entity to qualify as a bidder, participate in the Bidding Process and to make a higher or otherwise better offer to purchase the Purchased Assets. The Debtors and their professionals, agents and other representatives: (i) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets; and (ii) faithfully executed their duties in considering all offers and bids throughout the Bidding Process and in determining that AZZ is the Successful Bidder for the Purchased Assets.

G.    Azz is the Successful Bidder for the Purchased Assets.

**Highest and Best Offer; Business Judgment**

H.    The Debtors demonstrated a sufficient basis to enter into the Purchase Agreement, sell the Purchased Assets on the terms outlined therein and assume and assign the Assumed Contracts under sections 363 and 365 of the Bankruptcy Code, and all such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors and their estates.

I.    The AZZ offer, upon the terms and conditions set forth in the Purchase Agreement, and the various related agreements contemplated thereby (collectively, the "Related Agreements"), including the form and the total consideration to be realized by the Debtors pursuant to the Purchase Agreement: (i) are the  highest and best offer received by the Debtors after marketing, including through the Bidding Procedures and following the conclusion of the Auction; (ii) are fair and reasonable; (iii) are in the best interest of the Debtors, their creditors and their estates; and (iv) constitutes full and adequate consideration and reasonably equivalent value for the Purchased Assets.

J.    The Debtors' determination that the Sale set forth in the Purchase Agreement constitutes the highest and best offers for the Purchased Assets is a valid and sound exercise of their business judgment. The Debtors have determined that the sale of the Purchased Assets under the terms set forth in the Purchase Agreement and the Related Agreements represent the best opportunity for the Debtors' estates to realize the greatest value for the Purchased Assets and will provide a greater recovery for the Debtors' creditors, including through a reduction of claims against the Debtors' estates, than would be provided by any other practical or available alternative.

## Good Faith, Arms' Length Sale

K.     AZZ is a purchaser in good faith, as that term is used in the Bankruptcy Code, and are entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Purchased Assets. The Purchase Agreement and the Related Agreements were negotiated and entered into in good faith, based upon arm's length negotiations and without collusion or fraud of any kind.

L.     AZZ and its professionals, agents and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Purchase Agreement, and the Sale and the Purchase Agreement comply with the Bidding Procedures Order and all other applicable orders of this Court.

M.     AZZ and any of its affiliates, members, officers, directors, shareholders or any of its respective successors and assigns are not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling shareholders exists between the Debtors or AZZ.

N.     AZZ and the Debtors have not engaged in any conduct that would cause or permit the Sale, the Purchase Agreement or any Related Agreements be avoided pursuant to section 363(n) of the Bankruptcy Code.

O.     The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors. The Sale does not constitute a *sub rosa* plan.

## Corporate Authority

P.    Each of the Debtors is not a "foreign corporation" as that term is defined in Section 1445 of the Internal Revenue Code.

Q.    The Purchased Assets are property of the Debtors' estates under section 541 of the Bankruptcy Code. The Sale of the Purchased Assets by the Debtors has been duly and validly authorized by all necessary action and, upon entry of this Sale Order, the Debtors will have full power and authority to execute the Purchase Agreement, the Related Agreements and all other documents contemplated thereby. No consents or approvals other than those provided for in the Purchase Agreement and the Related Agreements are required for the Debtors to consummate the Sale described in the Purchase Agreement.

## Satisfaction of Section 363(f)

R.    The Debtors may sell the Purchased Assets free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever (collectively, the "Liens and Claims")[2] except as otherwise provided in the Purchase Agreement, because, in each case, one or more of the standards set forth sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those non-Debtor parties with interests in the Debtors' assets who did not object, or who withdrew their objections, to the Sale Motion with respect to the relief granted herein are deemed to have consented to the Sale free and clear of Liens and Claims pursuant to section

---

[2] For the avoidance of doubt, the term "Liens and Claims" as used herein includes, without limitation, any mortgage, lien (as such term is defined in 11 U.S.C. § 101(37), including any mechanic's, materialman's, statutory, cash collateral or carve out lien or any other consensual or non-consensual lien), security interest, charge, hypothecation, deed of trust, pledge, right of use, first offer or refusal, easement, servitude, restrictive covenant, lease, sublease, covenant, right of way, option, restriction (including any restriction on transfer or on the use, voting, receipt of income or other rights or exercise of any attributes of ownership), conditional sale or other title retention agreements, interest, encroachment, encumbrance of any kind, debt, liability, obligation or claim (as that term is defined in 11 U.S.C. § 101(5)), and including any claim against AZZ and/or any of the assets or properties of AZZ (including the Purchased Assets) based on a theory of successor liability, alter-ego or any similar theory of liability, and all costs and expenses relating thereto. Further, without limiting the foregoing, the term "Liens and Claims" as used herein includes any debts, liabilities, obligations or claims whether they are direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

363(f)(2) of the Bankruptcy Code. Accordingly, except as expressly provided in the Purchase Agreement with respect to the Assumed Liabilities (as defined in the Purchase Agreement), all persons or entities having Liens or Claims against or in any of the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens and Claims against the Purchased Assets, AZZ, or any of their assets, property, successors or assigns.

**No Successorship**

S.    AZZ is not a continuation of the Debtors. In particular:

 i.    AZZ is not holding itself out to the public as a continuation of any of the Debtors.

 ii.   There is no substantial continuity between AZZ and any of the Debtors, and there is no continuity of enterprise between AZZ and any of the Debtors.

 iii.  AZZ: (i) is not, as a result of any action taken in connection with the purchase of the Purchased Assets or otherwise, successors to any of the Debtors; and (ii) has not, de facto or otherwise, merged or consolidated with or into any of the Debtors.

 iv.   The Sale does not amount to a consolidation, merger or de facto merger of AZZ and any of the Debtors.

 v.    The Sale is not being entered into fraudulently.

 vi.   AZZ is a bona fide purchaser in good faith of the Purchased Assets.

**Assumption and Assignment of the Assigned Contracts**

T.    The agreements and leases identified in the Cure Notice (collectively, the "Assumed Contracts") are either: (i) executory contracts or unexpired leases subject to section 365 of the Bankruptcy Code or (ii) non-executory contracts that may be assigned to AZZ according to their terms and applicable law. Except where the facts or context require otherwise, the term Assumed Contracts herein refers to executory contracts or unexpired leases subject to section 365 of the Bankruptcy Code.

U.    The Debtors may assume each of the Assumed Contracts, and assign each of them to AZZ pursuant to sections 363 and 365 of the Bankruptcy Code and this Sale Order, notwithstanding any anti-assignment clause or other similar provision in any Assumed Contract, as provided by section 365(f) of the Bankruptcy Code. The assumption and assignment of the Assumed Contracts is in the best interest of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. AZZ and the Debtors have provided good and sufficient evidence of adequate assurance of future performance by AZZ under the Assigned Contracts consistent with sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

V.    The Cure Costs, if any, set forth in Exhibit A to the Cure Notice with respect to each Assigned Contract are the sole amounts necessary under sections 365(b)(l)(A), 365(b)(l)(B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses under the Assumed Contracts. AZZ shall pay the Cure Cost for each of their respective Assumed Contracts in accordance with the Purchase Agreement.

## Findings of Fact/Conclusions of Law

W.    All findings of fact and conclusions of law announced by the Court at the Sale Hearing are incorporated herein.

**Time is of the Essence**

X.      Time is of the essence in consummating the Sale. To maximize the value of the Purchased Assets and minimize the costs incurred by the Debtors' estates, it is essential that the sale occurs promptly, and within the time constraints set forth in the Purchase Agreement. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The Sale Motion is **GRANTED** with respect to the approval of the Sale, as further described herein.

2.      All objections to the relief granted herein, whether filed, stated on the record in Court or otherwise, are **OVERRULED** on the merits and with prejudice to the extent they have not been withdrawn, waived or resolved.

3.      All objections to the relief granted herein that were not timely filed are hereby forever **BARRED**.

**Approval of the Purchase Agreement**

4.      The Purchase Agreement and the Related Agreements, and all of the terms and conditions thereof, are hereby approved in all respects.

5.      The sale of the Purchased Assets to AZZ, as set forth in the Purchase Agreement, is approved pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and the Debtors and AZZ, and its respective affiliates, officers, directors, employees,

professionals, agents and other representatives are authorized to immediately take any and all

such actions as are necessary or appropriate to consummate and implement the Purchase

Agreement and the Related Agreements.

6.       The Debtors and their agents and other representatives, as applicable, are

authorized to execute and deliver the Purchase Agreement and the Related Agreements,

together with all additional agreements, instruments and documents that may be reasonably

necessary or desirable to implement the Purchase Agreement and effectuate the provisions of

this Sale Order and the transactions approved hereby, all without further order of the Court.

Additionally, pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby

authorized and empowered to fully assume, perform under, consummate and implement the

Purchase Agreement and the Related Agreements, together with such additional agreements,

instruments and documents that may be reasonably necessary or desirable to implement the

Purchase Agreement, and to take all further actions as may reasonably be requested byAZZ

for the purpose of selling, assigning, transferring, granting, conveying, conferring and

delivering to AZZ, or transferring to the AZZ' possession, any or all of the Purchased Assets,

or as may be necessary or appropriate to the performance of the obligations, and make

effective the transactions contemplated by, the Purchase Agreement, all without further order

of this Court.

### Transfer of the Purchased Assets

7.       Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors are

authorized to transfer the Purchased Assets in accordance with the terms of the Purchase

Agreement, and, upon the Closing under the Purchase Agreement, such transfers shall: (a) be

valid, legal, binding and effective transfers; (b) vest AZZ with all right, title and interest of the

Debtors in and to the Purchased Assets; and (c) be free and clear of all Liens and Claims, whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases, and whether imposed by agreement, law, equity or otherwise, with all such Liens and Claims attaching to the proceeds of the sale in the same validity, enforceability, priority, force and effect as they attached to Purchased Assets before the sale, subject to the rights, claims, defenses and objections (if any) of all interested parties with respect to such Liens and Claims, including the rights of the Debtors' estates under chapter 5 of the Bankruptcy Code.

8.      All persons or entities holding Liens and Claims with respect to the Purchased Assets are hereby barred from asserting such Liens and Claims against AZZ, its successors or assigns or the Purchased Assets.

9.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to AZZ in accordance with this Sale Order and the terms of the Purchase Agreement.

## Assumption and Assignment of the Assumed Contracts

10.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the assumption and assignment to AZZ of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. To the extent that any Assumed Contract is not an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, such Assumed Contract is hereby assigned to AZZ at the Closing in accordance with their terms and applicable law.

11.     The Debtors are hereby authorized to execute and deliver to AZZ such agreements, documents or other instruments as may facilitate or document the sale, assignment, transfer, conveyance and deliver the Assumed Contracts to them.

12.     Upon the Closing: (a) the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, AZZ in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer; and (b) pursuant to section 365(k) of the Bankruptcy Code and other applicable law, the Debtors shall be relieved from any further liability with respect to the Assumed Contract after such assignment to and assumption by AZZ.

13.     All defaults or other obligations of the Debtors under any Assumed Contract arising or accruing prior to the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured upon payment of the Cure Costs with respect to each Assumed Contract.

14.     Except for the right to enforce the obligation to pay the Cure Costs, each non-debtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtors, AZZ, or the property of any of them, any default existing as of the date of the entry of this Sale Order, whether declared or undeclared or known or unknown; or, against AZZ, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors.

15.     The failure of the Debtors or AZZ to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of AZZ' rights to enforce every term and condition of the Assumed Contract.

16.     The payment of the Cure Costs (if any) shall: (a) effect a cure of all defaults existing thereunder as of the Closing Date; (b) compensate for any actual pecuniary loss to such non-debtor party resulting from such defaults; (c) constitute a satisfaction in full of all amounts accrued as of the Closing Date; and (d) together with the assumption and purchase of the Assumed Contracts by AZZ, constitute adequate assurance of future performance thereof. After the payment of the relevant Cure Costs, neither the Debtors nor AZZ shall have any further obligations to the non-debtor parties to the Assumed Contracts other than the obligations of AZZ that accrue under the Assumed Contracts on or after the Closing Date.

17.     Upon the Closing Date and the payment of the relevant Cure Costs, AZZ shall be deemed to be substituted for the relevant Debtor(s) as a party to the applicable Assumed Contracts, and the Debtors shall be relieved from all liability on such Assumed Contracts arising on or after the Closing Date.

18.     AZZ has provided adequate assurance of future performance under each Assumed Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

## **Additional Provisions**

19.     In accordance with the agreement of the parties involved, the Bidding Procedures Order and the *Agreed Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing and Use Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 and 507(b), (II) Granting Adequate Protection Pursuant to 11 U.S.C. § 361, 362, 363, 364, and 507(b)*

(Docket No. 168), upon entry of this Order, all Net Proceeds (as defined herein) from the Sale

shall be remitted to the Pre-Petition Lenders and the DIP Lenders upon the Closing. As used

in this paragraph, Net Proceeds means all proceeds from the Sale, net of:

a)      fees to Livingstone Partners LLC that are approved by this Court;

b)      ad valorem taxes asserted by the Harris County, Texas ad valorem taxing

authority at Docket No. 89, which is in the aggregate amount of $42,448.92;

c)      each of the ad valorem taxes asserted by the (i) City of Chattanooga at Claim

Number 35 in the amount $22,688.51, (ii) the Hamilton County Trustee at

Claim Number 36 in the amount of $27,553.03, and (iii) the Aldine

Independent School District at Claim Number 27 in the amount of $69,158.45,

all of which shall be held in escrow pending further order of the Court; and

d)      the Winddown, as defined and described herein.

20.     A maximum aggregate amount of $75,000 of the Net Proceeds shall be

escrowed and may be used to fund the costs and fees of winding down the Debtors' chapter

11 cases incurred by the Debtors and their estates from and after the closing of the Sale of the

Collateral (the "Winddown"). The Debtors hereby covenant and agree to work cooperatively

with the Committee of Unsecured Creditors, the Pre-Petition Lenders, and the DIP Lenders on

the formation and confirmation of a liquidating plan of reorganization to be filed no later than

May 1, 2018.

21.     For the avoidance of doubt, this Order shall not modify or alter the security

interests of the Pre-Petition Lenders and the DIP Lenders in the Net Proceeds, and pending

further order of this Court, the Pre-Petition Lenders and the DIP Lenders shall retain their

respective security interests in the Net Proceeds. The Net Proceeds held in escrow pursuant to

¶¶ 19(c) and (d) shall be paid to the Pre-Petition Lenders and the DIP Lenders unless (x) the Net Proceeds are paid by the Debtors pursuant to the terms and conditions contained in this Order, or (y) otherwise ordered by this Court.

22.     Other than payment of the remaining $450,000 DIP proceeds, which shall be paid to the Debtors upon entry of this Order, and payment of the Winddown neither the Pre-Petition Lenders nor the DIP Lenders are obligated to provide any further financing to the Debtors, and the Debtors, their advisors and their officers and directors will make no additional funding requests to the Pre-Petition Lenders or the DIP Lenders.

23.     Notwithstanding anything to the contrary in the Chattanooga Purchase Agreement or the Houston Purchase Agreement: (i) The Closing contemplated by the Purchase Agreement shall occur on March 23, 2018, at 11:59:59 p.m. ET, unless otherwise agreed to by the Debtors, AZZ, the Pre-Petition Lenders, the DIP Lenders, the Unsecured Creditors Committee and the United States Trustee, in writing; and (ii) the Closing contemplated by the Houston Purchase Agreement shall occur no later than March 31, 2018.  The Closing of the Chattanooga Purchase Agreement shall take  place at Akerman LLP, 2001 Ross Avenue, Suite 3600, Dallas, Texas 75201.

24.     From and after the Closing for a period of one (1) year (the "Access Period") following the Closing Date, the Purchaser will provide the Debtors and their advisors with reasonable access, during normal business hours, upon reasonable advance notice, to the books and records, including, but solely to the extent in the possession of the Purchaser at the time of the request, work papers, schedules, memoranda, tax returns, tax schedules, tax rulings, and other documents (for the purpose of examining and copying) relating to the Purchased Assets or the Assumed Liabilities exclusively with respect to periods or

occurrences prior to the Closing Date ("Material Records") and reasonable access, during

normal business hours, and upon reasonable advance notice, to employees, officers, advisors,

accountants, offices and properties (including for the purpose of better understanding such

books and records) of Purchaser, in each case, for purposes directly relating to the Debtors'

bankruptcy cases, the wind-down of the operations of Debtors and their estates, actions to

which any Debtor is a party, insurance claims, tax payments, returns or audits, the functions

of any trusts established under the Liquidating Plan or any other successors of the Debtors

(including a plan administrator or a liquidating trustee, pursuant to the Liquidating Plan) (any

information disclosed by such persons or related to such access, collectively with Material

Records, "Pre-Acquisition Records").  Any access or disclosure of Pre-Acquisition Records

shall be subject to a confidentiality agreement executed between the Purchaser and the

Debtors prior to such access or disclosure and in a form satisfactory to the Purchaser (consent

to a form not to be unreasonably withheld by the Purchaser). Unless otherwise consented to in

writing by the Debtors or their representatives, Purchaser will not, for a period of one (1) year

following the Closing Date, intentionally make any bulk destruction of any of the Material

Records (other than additional copies thereof) without first offering to surrender to the

Debtors such Material Records to be destroyed.  Furthermore and notwithstanding the

foregoing, Purchaser shall have no liability to the Debtors, their affiliates or their or their

respective estates for any (i) unintentional or negligent destruction of any records, (ii)

destruction due to failure of the Epicore system or failure of other electronic data systems, or

(iii) minor destruction of any records by personnel in the ordinary course of daily business

(i.e. deletion of emails from in boxes, personal files in offices, or similar).  Debtors, their

affiliates or their or their respective estates shall indemnify and hold harmless Purchaser for

any loss or damage in connection with the access to or disclosure of Pre-Acquisition Records granted herein.

25.    AZZ shall not have any obligation, as successors or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans), or any other payment to employees of the Debtors or any of its affiliates, and the AZZ shall not have any liability, as successors or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, with respect to the following (collectively, the "Employee Obligations"), unless specifically provided for in the Purchase Agreement: (a) any employment or labor agreements (including, without limitation, any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which any Debtors or any of its affiliates are a party; (b) any pension, welfare, compensation, retention, incentive or other employee benefit plans, agreements, practices, or programs to which any Debtors or any of its affiliates are a party, including, without limitation, any pension plan at any time sponsored, maintained, contributed to, or required to be contributed to by any of the Debtors, any of its affiliates, or any member of any of their respective controlled groups (within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code or Section 4001(b)(1) of Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (c) the cessation of the Debtors' operations, dismissal of employees, or termination (including, without limitation, rejection) of employment or labor agreements (including, without limitation, any collective bargaining

agreements), consulting agreements, severance agreements, change-in-control agreements, other similar agreements or pension, welfare, compensation, retention, incentive or other employee benefit plans, agreements, practices, programs, or obligations that might otherwise arise from or pursuant to ERISA, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Worker Adjustment and Retraining Notification Act or otherwise; or (d) workmen's compensation or occupational disease, unemployment, or temporary disability insurance claims (any agreement, plan, policy, practice, arrangement, or program described in (a) through (d), collectively the "Employee Arrangements").  AZZ shall not in any way, as successor or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, be deemed a party to or assignee of any Employee Arrangement, and no employee of AZZ shall be deemed in any way covered by or a party to any Employee Arrangement, and all parties to any Employee Arrangement are hereby enjoined from asserting against AZZ any and all interests or claims arising from or relating to such Employee Arrangement.  AZZ shall not have any responsibility or liability for giving any notices to the Debtors or its affiliated employees pursuant to the Workers Adjustment and Relocation Adjustment Act, or any similar federal, state or other applicable law.  The Purchased Assets are transferred by the Debtors free and clear of all Employee Obligations and all Employee Arrangements.

26.      Except for the Assumed Liabilities, AZZ is not, unless specifically provided by the Purchase Agreement and the other transactions contemplated thereby, assuming, nor shall AZZ be liable or responsible, as successor or otherwise (including, without limitation, with

respect to successor or vicarious liabilities of any kind or character), under any theory of law

or equity, including, without limitation, any theory of antitrust, environmental successor or

transferee liability, labor law, alter ego, de facto merger or substantial continuity, whether

known or unknown as of the assignment date, now existing or hereafter raised, which may be

asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the

Debtors or any of its predecessors or affiliates or the obligations of the Debtors or its

predecessors or affiliates arising prior to the assignment date, for any liabilities, debts,

commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute,

contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from

the Assumed Contracts on or prior to the assignment date or any such liabilities, debts,

commitments, or obligations that in any way whatsoever related to periods on or prior to the

assignment date or are to be observed, paid, discharged, or performed on or prior to the

assignment date (in each case, including, without limitation, any liabilities that result from,

relate to, or arise out of tort or other product liability claims), or any liabilities calculable by

reference to the Debtors or their assets or operations, or relating to continuing conditions

existing on or prior to the assignment date, including, without limitation, with respect to any

of the Debtors' predecessors or affiliates, which liabilities, debts, commitments, and

obligations are hereby extinguished insofar as they may give rise to successor liability,

without regard to whether the claimant asserting any such liabilities, debts, commitments, or

obligations has delivered to AZZ a release thereof.  Without limiting the generality of the

foregoing and except for the Assumed Liabilities, by virtue of the consummation of the Asset

Purchase Agreement and the other transactions contemplated thereby, AZZ shall not be liable

or responsible, as a successor or otherwise (including, without limitation, with respect to

successor or vicarious liabilities of any kind or character) under any theory of law or equity, for the Debtors' liabilities, debts, commitments, or obligations arising under or in connection with: (a) environmental liabilities, debts, claims, or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et am; (b) any bulk sales or similar law; (c) any liabilities, debts, commitments, or obligations of, or required to be paid by, the Debtors for any taxes of any kind for the pre-closing period; (d) any liabilities, debts, commitments, or obligations for any taxes relating to the Assumed Contracts to the pre-Closing period; (e) any litigation; (f) any products liability, other tort, or similar claims, whether pursuant to any state or any federal laws or otherwise, including, without limitation, those arising from products or distribution thereof by or on behalf of the Debtors; and (g) any excluded liabilities.

27.     Debtor's shall carve-out $115,000 from the Debtor's DIP Facility (whether disbursements are made or yet to be made) to be set aside for the fees of the Official Committee of Unsecured Creditors, subject to application to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines promulgated by the Office of the United States Trustee, the Local Rules and Orders of this Court, and pursuant to any additional procedures that were established by the Court in this case.  The funding of the DIP Facility, inclusive of the carve-out referenced in this paragraph fully satisfies the Lender's obligations under the DIP Order as to the Official Committee of Unsecured Creditors  – and the Official Committee of Unsecured Creditors further agrees not to seek or request additional distribution from the Lender related to such carved-out funds.

28.    The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to implement the terms and provisions of the Purchase Agreement and the Related Agreements and the provisions of this Sale Order.

29.    AZZ is a party in interest and shall be entitled to be heard on all issues in these chapter 11 cases related to the Purchase Agreement, the transactions contemplated thereby, and the implementation or enforcement of this Sale Order.

30.    25.Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in these chapter 11 cases, any subsequent chapter 7 or chapter 11 cases of the Debtors, or any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the terms of this Sale Order or the Purchase Agreement.

31.    Each and every federal, state and local government agency or department and all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds and other similar persons are hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement the Related Agreements and this Sale Order.

32.    If any person or entity that has filed financing statements, mortgages, liens, lis pendens, mechanics' or materialmen's liens, notices of levy or other documents evidencing Liens and Claims against the Purchased Assets (other than with respect to the Assumed Liabilities, as defined in the  Purchase Agreement) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens and Claims that the person or entity has with respect to such Purchased Assets, such Liens and Claims shall be deemed released by this Sale Order, and the Debtors, or AZZ after the closing, are hereby

authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to such Purchased Assets. Without limiting the foregoing, a certified copy of this Sale Order may be filed with the appropriate Clerk's office and/or recorded with the applicable Recorder's office as evidence to cancel the Liens and Claims of record, except the Assumed Liabilities, as defined in the Purchase Agreement.

33.    All persons or entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to AZZ on the Closing Date.

34.    AZZ is deemed to be a bona fide purchaser in good faith of the Purchased Assets and, thus, are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

35.    AZZ has given substantial consideration under the se Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability against AZZ.  Upon consummation of the Sale, AZZ shall not be deemed to (a) be the successor to the Debtors, (b) have, de facto or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors.

36.    Except to the extent AZZ otherwise specifically agreed in the Purchase Agreement or as set forth in this Order, AZZ shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities or other obligations related to the Purchased Assets prior to Closing Date.

37.     Nothing in this Sale Order or the se Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing. Nothing in this Sale Order or the  Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law.

38.     The terms and provisions of the  Purchase Agreement, together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Debtors' estates and the Debtors' creditors, AZZ and their affiliates, successors and assigns and any affected third parties and persons or entities asserting a claim against or interest in or lien on the Debtors' estates or any of the Purchased Assets to be sold to AZZ pursuant to the  Purchase Agreement. The provisions of this Sale Order and any actions taken pursuant hereto shall survive any order of this Court dismissing or converting these cases.

39.     The Purchase Agreement, the Related Agreements and any other related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court. The provisions of this Sale Order are non-severable and mutually dependent.

40.     The failure specifically to reference any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the efficacy of such provision. In the event of a conflict between the term of this Sale Order and the Purchase Agreement or any Related Agreement, this Sale Order shall govern.

41.    The Debtors and AZZ are hereby authorized to take all actions reasonably necessary to effectuate the terms of the Purchase Agreement and the Related Agreements, the transactions contemplated thereunder and the provisions of this Sale Order, all without the necessity of any further order of the Bankruptcy Court.

42.    The provisions of Bankruptcy Rules 6004(h) and 6006(d) shall not apply to stay consummation of the sale of the Purchased Assets to AZZ under the Purchase Agreement, as contemplated in the Sale Motion and approved by this Sale Order, and the Debtors and AZZ is hereby authorized to consummate the transactions contemplated and approved herein immediately upon entry of this Sale Order.

43.    This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the Purchase Agreement, the Related Agreements, all amendments thereto, any waivers thereunder and any other agreements executed in connection therewith; (b) resolve any disputes arising under or related to the Purchase Agreement and transactions contemplated thereby; and (c) interpret, implement and enforce the provisions of this Sale Order. Notwithstanding the foregoing, nothing in this Sale Order or the Purchase Agreement divests any tribunal of any jurisdiction it may have under police or regulatory law.

**IT IS SO ORDERED.**

### ###

APPROVED FOR ENTRY BY:


**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

 /s/Justin Sveadas
Justin Sveadas (TN #22305)
Erno Lindner (TN #29273)
1800 Republic Center
633 Chestnut Street
Chattanooga, Tennessee 37450
Telephone: (423) 756-2010
Facsimile:  (423) 756-3447
E-mail:  jsveadas@bakerdonelson.com
            elindner@bakerdonelson.com



**HUSCH BLACKWELL LLP**

/s/ Caleb T. Holzaepfel
Caleb T. Holzaepfel, TN Bar No. 033356
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
Telephone: (423) 755-2654
Facsimile: (423) 266-5499
Caleb.Holzaepfel@huschblackwell.com

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
OF LECTRUS CORPORATION, ET AL.**


**UNITED STATES TRUSTEE, REGION 8**

/s/ David Holesinger
David Holesinger (#030189)
Trial Attorney
Office of the U.S. Trustee
31 East 11th Street, 4th Floor
Chattanooga, TN  37402
Phone  (423) 752-5156
Email:  David.Holesinger@usdoj.gov

**FROST BROWN TODD LLC**

/s/ Ronald E. Gold
Ronald E. Gold, Esq.
Ohio Bar No. 0061351
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile:  (513) 651-6981
Email:  rgold@fbtlaw.com

-and-

Lynda M. Hill, Esq.
The Pinnacle at Symphony Place
150 Third Avenue South, Suite 1900
Nashville, Tennessee 37201
Telephone: (651) 251-5550
Facsimile:  (651) 251-5551
Email: lhill@fbtlaw.com

**COUNSEL TO HD SPECIAL SITUATIONS II, LP
AND HD SPECIAL SITUATIONS II, LP**


**HORTON, BALLARD & PEMERTON PLLC**

By: /s/  William H. Horton
William H. Horton, BPR No. 1935
735 Broad Street, Suite 306
Chattanooga, Tennessee 37402
Telephone: (423) 826-2640
Facsimile: (423) 826-2639

**COUNSEL TO MSI PARTNERS LLC**

**AKERMAN LLP**

/s/ John E. Mitchell
John E. Mitchell
Texas Bar 00797095
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Tel: (214) 720-4344
Email: john.mitchell@akerman.com

* Not licensed in Tennessee

**ATTORNEYS FOR AZZ ENCLOSURE SYSTEMS – CHATTANOOGA LLC**

**Execution Version**

# ASSET PURCHASE AGREEMENT

dated as of

**March 19, 2018**

between

**AZZ ENCLOSURE SYSTEMS  - CHATTANOOGA LLC**,

**a Delaware limited liability company**

and

**LECTRUS CORPORATION**,

**a Tennessee corporation**

**Execution Version**

### ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "**Agreement**") dated as of March 19, 2018 by and between **AZZ ENCLOSURE SYSTEMS - CHATTANOOGA LLC**, a Delaware limited liability company or its designees ("**Buyer**"), and **LECTRUS CORPORATION**, a Tennessee corporation with a principal place of business at 1919 W. Polymer Drive, Chattanooga, TN 37421 (the "**Seller**").

### W I T N E S E T H:

WHEREAS, the Seller offers custom engineering, project management, integration, site installation and post-sale customer support services relating to the design and manufacture of custom metal enclosures and electrical and mechanical integration;

WHEREAS, on December 7, 2017 (the "**Petition Date**"), the Seller and Lectrus Holding Corp. filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Tennessee (the "**Bankruptcy Court**");

WHEREAS, Buyer desires to purchase certain assets and assume certain liabilities of the Seller, and the Seller desires to sell certain assets and transfer certain liabilities of the Seller to Buyer, upon the terms and subject to the conditions hereinafter set forth;

WHEREAS, the parties hereto intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (as hereinafter defined); and

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
DEFINITIONS

Section 1.01.    *Definitions.*    As used herein, the following terms have the following meanings:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, formal inquiry, audit, citation, summons, subpoena, notice of violation, proceeding or litigation, whether civil, criminal, administrative, regulatory, at law, in equity or otherwise.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "**control**" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership

of voting securities, by Contract or otherwise, and the terms "**controlling**" and "**controlled**" have correlative meanings.

"**Auction**" means the auction undertaken pursuant to the Bidding Procedures Order and any amendments thereto.

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Avoidance Action**" means any avoidance, preference or recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law.

"**Bankruptcy Case**" means the cases, as jointly administered, commenced by the Seller and Lectrus Holding Corp. under chapter 11 of the Bankruptcy Code, styled In re: Lectrus Corporation, et al., Debtors, Case No. 1:17-bk-15588 and pending before the Bankruptcy Court.

"**Bankruptcy Code**" means title 11 of the United States Code, sections 101 *et. seq*.

"**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"**Bidding Procedures**" means the bidding procedures approved by the Bidding Procedures Order, together with such changes thereon, if any, as shall have been made in accordance with the Bidding Procedures Order.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures and all amendments thereto.

"**Business**" means the business, operations (including custom engineering, project management, integration, site installation and post-sale customer support services relating to the design and manufacture of custom metal enclosures and electrical and mechanical integration) and ownership of the Seller related to the Purchased Assets.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in Chattanooga, Tennessee are authorized or required by Applicable Law to close.

"**Cash Deposit**" means One Hundred Fifty Thousand Dollars ($150,000.00).

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986.

"**Contract**" means any note, bond, mortgage, indenture, agreement, lease, sublease, license, sublicense, contract, trust, instrument, arrangement, guarantee, purchase order or other commitment, obligation or understanding, whether oral or written, that is legally binding.

"**Cure Notice**" has the meaning ascribed to such term in the Bidding Procedures.

"**DIP Lenders**" means Great American Life Insurance Company, Great American Insurance Company and HD Special Situations III, LP and any whole or partial successor or assign thereof.  Great American Life Insurance Company and Great American Insurance Company transferred their claims in the Bankruptcy Case to MSI Partners, LLC on March 7, 2018.

"**Disclosure Schedule**" means the disclosure schedule regarding this Agreement that has been provided by the Seller to Buyer in accordance with Section 10.02(g), as may be amended in accordance with the terms of this Agreement.

"**Environmental Law**" means any Applicable Law or any legally binding agreement with any Person relating to (i) the pollution, protection or reclamation of the environment, or (ii) any spill, emission, release or disposal into the environment of, or human exposure to, any pollutant, contaminant or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material.

 "**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Code.

"**Excluded Leases**" means the Leases other than the Assumed Leases.

 "**Excluded Receivables**" means those certain invoices to ABB, Inc.: (i) Invoice No. 31143 / PO Number 4502101484, dated February 8, 2018, in the amount of $61,862.85, (ii) Invoice No. 31161A / PO Number 4501846915, dated February 13, 2018, in the amount of $762,533.99; (iii) Invoice No. 31192 / PO Number 4501846915 dated March 2, 2018, in the amount of $147,189.86; and (iv) Invoice No. 31197 / PO Number 4501846915 dated March 8, 2018, in the amount of $55,377.00.  Excluded Receivables also includes any accounts receivable aged over ninety (90) days at the time of Closing.[1]

"**Final DIP Order**" means that certain Agreed Final Order (i) Authorizing Debtors to Obtain Post-Petition Financing and Use Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 and 507(b), and (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), to be entered by the Bankruptcy Court.

"**GAAP**" means Generally Accepted Accounting Principles in the United States.

---

[1] To be confirmed by Buyer based on back-up documentation provided by Seller.

**Execution Version**

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court, agency or official, including any political subdivision thereof.

"**Governing Documents**" means, with respect to any particular entity: (i) if a corporation, the articles or certificate of incorporation and the bylaws; (ii) if a general partnership, the partnership agreement and any statement of partnership; (iii) if a limited partnership, the limited partnership agreement and the certificate of limited partnership; (iv) if a limited liability company, the articles of organization and operating agreement; (v) if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (vi) all equityholders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the equityholders of any Person; and (vii) any amendment or supplement to any of the foregoing.

"**Hazardous Material**" means any pollutant, contaminant or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material that in each case (i) the presence of which requires investigation or remediation under any Environmental Law or (ii) is regulated, listed or controlled by, under or pursuant to any Environmental Law.

"**Indebtedness**" means, with respect to any Person, (i) all indebtedness for borrowed money, (ii) all indebtedness evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (iii) all obligations for the deferred purchase price of property or services (including any earnout or bonus payments, but excluding trade payables incurred in the ordinary course of business), (iv) all obligations under capitalized leases, (v) all guarantees or other commitments by which such Person assures a creditor against loss (including contingent reimbursement obligations regarding letters of credit), (vi) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property, (vii) all obligations under commodity swap agreements, commodity cap agreements, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements and other similar agreements, (viii) all guaranties of any of the foregoing, and (ix) all outstanding prepayment premiums, if any, and accrued interest, fees and expenses related to any of the items set forth in clauses (i) through (viii).

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the laws of any jurisdiction throughout the world, including such property that is owned by the Seller ("**Company Intellectual Property**") and that in which the Seller holds exclusive or non-exclusive rights or interests granted by license from other Persons ("**Licensed Intellectual Property**"):

(a)    trademarks, service marks, trade names (current and previous), brand names, logos, slogans (including "Building Electrical & Mechanical Trust" and "The Lectrus Way"), products (including names, features and benefits), named processes, trade dress and other branded Intellectual Property and proprietary indicia of goods and services, whether registered or

unregistered, and all registrations and applications for registration of such trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing;

(b)    internet domain names and universal resource locators (or URLs), whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority, and registrations and applications for registrations thereof;

(c)    the names "Lectrus" and "Metal Systems Inc. ("MSI");"

(d)    original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications;

(e)    confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable;

(f)    digital marketing assets, including but not limited to brochures, advertising, photographs and any and all digital assets utilized on Seller's website;

(g)    patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications;

(h)    moral and economic rights of authors and inventors (however denominated); and

(i)    computer software programs, including unique design software.

"**Interim DIP Order**" means that certain Agreed Interim Order (i) Authorizing Debtors to Obtain Post-Petition Financing and Use Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, 364 and 507(b), (ii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and (c).

"**Knowledge**" means (i) with respect to Buyer, the actual knowledge of the officers of Buyer listed on Schedule Section 1.01(a) and the knowledge that each such officer would have reasonably obtained after making due and appropriate inquiry with respect to the particular matter in question, and (ii) with respect to the Seller, to the actual knowledge of the officers of the Seller listed on Schedule Section 1.01(b) and the knowledge that each such officer would have reasonably obtained after making due and appropriate inquiry with respect to the particular matter in question.

"**Leased Real Property**" means all real property and other rights leased or subleased by the Seller pursuant to the Leases.

"**Leases**" means the real property leases and subleases to which Seller is a party, together with any and all rights, rights of way, easements, fixtures and improvements set forth in such leases and subleases.

"**Liabilities**" means all existing or future liabilities, debts, obligations, duties or adverse claims of the Seller of every type and trade, whether matured or unmatured, fixed or contingent, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, direct or indirect, or otherwise in respect of any and all matters or events, including those arising under Applicable Law, or imposed by any court or arbitrator of any kind, and those arising in connection with products sold, Contracts, Leases, commitments or undertakings, including all liabilities arising out of or related to the sponsorship of, the responsibility for, contributions to, or any liability in connection with any employee plan maintained or contributed to by the Seller. Without limiting the foregoing, Liabilities shall include any continuation coverage (including any penalties, excise Taxes or interest resulting from the failure to provide continuation coverage) required by Applicable Law due to qualifying events, including continuing coverage for any of the Seller's employees terminated prior to the Closing Date or whose employment is terminated in connection with the transaction contemplated hereby, or who were not hired by Buyer in connection with the transaction contemplated hereby, whether or not said Liabilities are reflected on the books of the Seller.

"**Lien**" means, with respect to any property or asset, any title defect, mortgage, lien, pledge, charge, security interest, bailment (in the nature of a pledge or for purposes of security), deed of trust, grant of a power to confess judgment, conditional sales and title retention agreement (including any lease or license in the nature thereof), claim, easement, encroachment, right of way, charge, condition, option, right of first refusal or last negotiation, offer or refusal, equitable interest, restriction or encumbrance of any kind.

"**Local Bankruptcy Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court applicable to all cases in such district governed by the Bankruptcy Code.

"**Loss(es)**" means all losses, Liabilities, obligations, damages, deficiencies, expenses, Actions, suits, proceedings, demands, assessments, interest, awards, penalties, fines, Taxes, costs and expenses of whatever kind (including reasonable attorneys' fees, court costs, expert witness fees, transcript costs and other expenses of litigation, costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers) and judgments (at law or in equity) of any nature.

"**Material Adverse Effect**" means any change, development, occurrence, circumstance or effect that, individually or in the aggregate, has had or would reasonably be expected to have, individually or in the aggregate with all other changes, developments, occurrences, circumstances or effects, a material adverse effect on the Purchased Assets, the Assumed Liabilities or the condition (financial or otherwise), assets, liabilities, business or results of operations of the Business, excluding any change, development, occurrence, circumstance or effect resulting from (A) changes in GAAP or changes in the regulatory accounting requirements applicable to any industry in which the Business operates, (B) changes in financial or securities markets or general economic or political conditions in the United States or any other country, (C)

6

changes (including changes of Applicable Law) in general conditions in the industry in which the Business operates, (D) acts of war, sabotage or terrorism or natural disasters, (E) the announcement of the transactions contemplated by this Agreement or the Transaction Documents (provided that this clause (E) shall not apply to any representation or warranty that, by its terms, speaks specifically of the consequences arising out of the execution or performance of this Agreement or any of the Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby), (F) any action taken (or omitted to be taken) at the written request of Buyer, (G) any failure by the Seller to meet any projections or forecasts for any period occurring on or after the date hereof (provided that this clause (G) shall not prevent a determination that any event, circumstance, effect or change underlying such failure to meet projections or forecasts has resulted in a Material Adverse Effect), (H) the filing of the Bankruptcy Case or (I) any action taken by the Seller that is expressly required pursuant to this Agreement, in each case of clauses (A), (B), (C) and (D), to the extent the Business is not materially disproportionately affected thereby as compared with other participants in the industry in which the Business operates.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Personal Property**" means all equipment, fixed assets and other tangible assets owned or used by the Seller (wherever situated), other than those constituting Excluded Assets, and all of the Seller's rights under warranties, indemnities, licenses, and all similar rights against third parties with respect to the equipment, fixed assets and other tangible assets referenced in this definition (to the extent such rights are assignable at no cost, expense or penalty to the Seller, or at Buyer's election if Buyer agrees to pay for such cost, expense or penalty).

"**Pre-Closing Tax Period**" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Pre-Petition Lenders**" means Great American Life Insurance Company, Great American Insurance Company, HD Special Situations II, LP, and HD Special Situations III, LP and any whole or partial successor or assign thereof.  Great American Life Insurance Company and Great American Insurance Company transferred their claims in the Bankruptcy Case to MSI Partners, LLC on March 7, 2018.

"**Pre-Petition Security Agreement**" means that certain Security Agreement dated as of November 15, 2013, by and among the Seller and the Pre-Petition Lenders, as the same has been and may be amended, amended and restated, supplemented, waived and/or otherwise modified from time to time.

"**Purchased Leased Real Property**" means the Assumed Leases (including all prepaid rents thereunder) and the Leased Real Property subject thereto.

"**Released Persons**" means Mark Arms, Rhonda Beard, Paul Bogard and James Beers.

"**Sale Order**" means an order of the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, *inter alia*, the sale of

the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer on the terms and conditions set forth herein, (ii) finding that the Assumed Leases are valid and enforceable in accordance with their terms, and (iii) containing certain findings of facts, including a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code, which Sale Order shall be satisfactory in form and substance to Buyer.

"**Subsidiary**" means, with respect to any Person at any time, any Person of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly owned or controlled by such Person.

"**Tax**" means (i) any and all taxes, charges, levies or other similar assessments or Liabilities in the nature of a tax, including income, gross receipts, ad valorem, premium, value-added, net worth, capital stock, capital gains, documentary, recapture, alternative or add-on minimum, disability, estimated, registration, recording, excise, real property, personal property, extraction, sales, use, license, lease, service, service use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, profits, severance, stamp, occupation, windfall profits, customs, duties, franchise and other taxes of any kind whatsoever imposed by a Governmental Authority, and any interest, fines, penalties, assessments or additions to tax imposed with respect to such items or any contest or dispute thereof or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means any Governmental Authority having or purporting to exercise jurisdiction with respect to any Tax.

"**Transaction Documents**" means this Agreement, the Assignment and Assumption Agreement and each other document, agreement or instrument executed and delivered in connection herewith (including, for the avoidance of doubt, all documents described in Section 2.07, Section 10.02 and Section 10.03), each of which shall be prepared in accordance with Section 7.07.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**Workers' Compensation Liabilities**" means any Liabilities or benefit obligations related to workers' compensation claims and benefits arising under Applicable Law.

Section 1.02 *Other Defined Terms*.  As used herein, each of the following terms is defined in the Section set forth opposite such term:

**Execution Version**

| Term | Section |
| --- | --- |
| Accounts Receivable | 2.01(n) |
| Agreement | Preamble |
| Alternative Transaction | 5.05 |
| Assignment and Assumption Agreement | 2.07(b)(i) |
| Assumed Contracts | 2.01(c) |
| Assumed Leases | 2.01(a) |
| Assumed Liabilities | 2.02(m) |
| Bankruptcy Court | Recitals |
| Bid Deadline | 11.01(h) |
| Business Employees | 9.01(a) |
| Buyer | Preamble |
| Cash Consideration | 2.06 |
| Chattanooga Leased Property | 2.07(b)(ii)(D) |
| Closing | 2.07(a) |
| COBRA | 2.04(p) |
| Company Parties | 5.15(b)(ii) |
| Company Software | 3.09(i) |
| Competing Bid | 5.05 |
| Cure Costs | 2.05(a) |
| e-mail | 12.01 |
| End Date | 11.01(b) |
| Excluded Assets | 2.02 |
| Excluded Contracts | 2.02(i) |
| Excluded Liabilities | 2.04 |
| Excluded Environmental Liabilities | 2.04(s) |
| Excluded Permits | 2.02(j) |
| Excluded Purchase Orders | 2.02(k) |
| General Intangibles | 2.01(p) |
| Hired Employee | 9.02(a) |
| Intellectual Property Registrations | 3.09(a) |
| Inventory | 2.01(o) |
| Offered Employees | 9.02(a) |
| Permits | 3.07(a) |
| Permitted Liens | 3.10 |
| Plans | 9.01(e) |
| Purchase Price | 2.06 |
| Purchased Assets | 2.01 |
| Removed Contract | 2.05(c) |
| Restricted Business | 5.15(a) |
| Restricted Party | 5.15(a) |
| Restricted Period | 5.15(a) |
| Restricted Territory | 5.15 |
| Seller | Preamble |
| Tennessee Courts | 12.07 |
| Top Customers | 3.15 |

Execution Version

| Term | Section |
|------|---------|
| Top Suppliers | 3.15 |
| Transferred Permits | 2.01(f) |
| Transfer Taxes | 8.01(b) |

Section 1.03 *Other Definitional and Interpretative Provisions.*  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any agreement or Contract are to that agreement or Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

ARTICLE 2

PURCHASE AND SALE

Section 2.01.  *Purchase and Sale.*  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Seller and the Seller agrees to sell, convey, transfer, assign and deliver to Buyer at the Closing, free and clear of all Liens except for Permitted Liens, under Bankruptcy Code Section 363 (b), (f) and (m), all right, title and interest of the Seller in, to and under all of the assets and properties owned, held or used in the conduct of the Business by the Seller (the "**Purchased Assets**") except for the Excluded Assets, including the following:

(a)        the Leases (including all prepaid rents thereunder) set forth on Schedule Section 2.01(a) (as such schedule may be modified pursuant to Section 2.05, collectively, the "**Assumed Leases**");

(b)        the Personal Property;

10

(c)      all right, title and interest of the Seller, and the respective Affiliates of the Seller, now or hereafter existing in, to and under (i) the Contracts listed on Schedule Section 2.01(c) (as such schedule may be modified pursuant to Section 2.05, collectively, the "**Assumed Contracts**") and (ii) such other Contracts entered into by the Seller or any Affiliate of the Seller in the ordinary course of business after the date hereof as permitted pursuant to Section 5.01 and Section 5.02 and added to Schedule Section 2.01(c) by Buyer pursuant to Section 2.05, in each case, as each such Contract may have been amended or otherwise modified prior to the date of (or as permitted in accordance with the terms of) this Agreement, provided that any purchase orders included in the Assumed Contracts shall be governed by the terms of the applicable master services agreement unless otherwise agreed upon by the parties hereto;

(d)      all rights of the Seller to use utility easements and other rights of way and easements used or held for use in the operation of the Purchased Assets or the Business;

(e)      all deposits (including security deposits for rent, deposits with vendors, telephone, other utilities or otherwise) and all prepaid or deferred charges and expenses, including *ad valorem* Taxes, leases and rentals, in each case to the extent directly provided or paid in connection with the Purchased Assets (but excluding any deposits or prepaid or deferred charges and expenses to the extent relating to any Excluded Asset or any Excluded Liability);

(f)      the Permits other than the Excluded Permits (collectively, the "**Transferred Permits**") and all cash and other collateral provided by, or on behalf of, the Seller with respect to any Transferred Permit, including each bond, surety bond, letter of credit and other financial assurance posted by the Seller in connection with the Transferred Permits and cash and cash equivalents securing the same;

(g)      all of the Seller's Intellectual Property (including all Intellectual Property Registrations);

(h)      all books, records, files, personnel files (to the extent relating to Hired Employees and reasonably required by Buyer to comply with its obligations under Article 9), invoices, market research, customers, distributors and suppliers lists, promotional materials and other papers, and engineering designs, drawings, specifications, CAD designs, blue prints, building know how, and similar documents and papers of all of Seller's products and services (whether located in Houston, Texas or Chattanooga, Tennessee), in each case whether in hard copy or computer format and in each case to the extent related to the Purchased Assets or the Business, including any information relating to any Tax imposed on the Purchased Assets or the Business (subject to Section 2.02(e));

(i)      all insurance proceeds, reserves, benefits or claims of the Seller under any insurance policies to the extent relating to the Assumed Liabilities, the Purchased Assets or the Business;

(j)      all goodwill associated with the Business;

11

Execution Version

(k)        all claims, causes of action (other than Avoidance Actions against third parties, but expressly including   Avoidance Actions against Buyer and non-debtor contract parties to Assumed Leases and Assumed Contracts and those parties identified on Schedule Section 2.01(k),  which shall be deemed Purchased Assets), causes of Action and rights of recovery, off-set and subrogation against third Persons, to the extent directly related to the Purchased Assets, but, subject to Section 2.01(q), not to include any claims against current or former officers or directors of the Seller, or its Affiliates;

(l)        all demands, reimbursements and rights of whatever nature, to the extent related to the Purchased Assets or any Assumed Liability (including rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment or components thereof, or arising from the breach by third parties of their obligations under the Assumed Contracts);

(m)        the assets set forth on Schedule Section 2.01(m) (for the avoidance of doubt, the assets set forth on Schedule Section 2.01(m) shall be considered Purchased Assets);

(n)        all accounts, accounts receivable, notes, notes receivable, rental agreements and other rights to collect rent, contract rights, drafts, acceptances, instruments, chattel paper, general intangibles, and other forms of obligation or rights to payment and receivables, whether or not yet earned by performance, including state and federal tax refunds, other than the Excluded Receivables (collectively, "**Accounts Receivable**");

(o)        all inventory as such term is defined in Section 9.102(48) of the UCC, wherever located, now owned or hereafter acquired by the Seller, including all and related merchandise and other personal property now owned or hereafter acquired by the Seller that is held for sale or lease, or is furnished or to be furnished under a contract of service or are raw materials, work in process, or materials or supplies used or to be used, or consumed or to be consumed, in the Seller's business, and all shipping and packaging materials relating to any of the foregoing (collectively, the "**Inventory**");

(p)        any and all general intangibles as such term is defined in Section 9.102(42) of the UCC, now owned or hereafter created or acquired by the Seller, including all inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, copyrights, registrations, business telephone numbers, licenses, franchises, rights to royalties, blueprints, drawings, confidential information, catalogs, sales literature, video tapes, customer lists, business records for each client including purchase history, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to the Seller to secure payment of any of the Accounts Receivable, all rights to indemnification and all other intangible property of every kind and nature, other than the Excluded Assets as described below (collectively the "**General Intangibles**");

(q)        any and all Actions or claims by Seller against the Released Persons;

(r)      all other assets of the Seller, except for assets that are specifically excluded in any of the foregoing clauses or in Section 2.02; and

(s)      any and all Actions or counterclaims directly relating to any of the foregoing Purchased Assets or any Assumed Liabilities.

It is the intention of the parties that Buyer acquire, lease or sublease all assets, properties and rights of the Seller and its Affiliates necessary for the operation of the Business and the Purchased Assets, but excluding the Excluded Assets. Subject to Section 2.05(c), if, within twelve months after the Closing, it is discovered that any assets, properties or rights of the Seller and its Affiliates, including rights under Contracts and purchase orders, owned, leased or subleased by the Seller and its Affiliates, other than the Excluded Assets, were not included in the Purchased Assets to be sold to Buyer, and such assets, properties or rights, individually or in the aggregate, are needed to be included as Purchased Assets in order to make the representation in Section 3.11 true in all respects, then the Seller shall, and shall cause its Affiliates to, assign, convey, lease or sublease, as applicable, such assets, properties or rights to Buyer, at no additional consideration (for the avoidance of doubt, the Purchase Price shall be deemed to include consideration for such assets, properties, or rights) in each case upon the reasonable request of Buyer and to the extent permitted by Applicable Law; provided, however, this obligation shall not include the assignment, conveyance, lease or sublease of any Excluded Asset other than any Contracts which the parties may mutually agree were omitted from Schedule Section 2.01(a), Schedule Section 2.01(c) or Schedule Section 2.01(m) in error and shall not require the payment by Seller or its Affiliates of any consent or related fee to the extent the consent of a third party is required for such assignment or conveyance.

Section 2.02.   *Excluded Assets*.   Notwithstanding anything herein to the contrary, Buyer expressly understands and agrees that the following assets and properties of the Seller (the "**Excluded Assets**") shall be excluded from the Purchased Assets:

(a)      all of the Seller's cash and cash equivalents on hand and in banks;

(b)      subject to Section 2.01(i), the insurance policies relating to the Business, and all claims, credits, causes of action or rights thereunder, to the extent such claims, credits, causes of action or rights relates to the operation of the Business or to events that occurred or arose prior to the Closing Date;

(c)      all books, records, files and papers, whether in hard copy or computer format, prepared in connection with this Agreement or the transactions contemplated hereby, and all personnel files (except as set forth in Section 2.01(h)) and minute books and corporate records of the Seller;

(d)      all rights of the Seller arising under this Agreement or the transactions contemplated hereby;

(e)      all refunds for Taxes incurred in a Pre-Closing Tax Period, including those relating to the Business or the Purchased Assets, and all Tax Returns of the Seller, together with all books and records (including working papers) related thereto;

(f)    all Tax assets (other than any prepaid Taxes) and net operating losses of the Seller;

(g)    all of the Seller's Avoidance Actions (other than Avoidance Actions against Buyer and non-debtor contract parties to Assumed Leases and Assumed Contracts and those parties identified on Schedule 2.01(k), which shall be deemed Purchased Assets), and all proceeds thereof;

(h)    the Excluded Leases (including all prepaid rents thereunder), including the Lease listed on Schedule Section 2.02(h), and the Leased Real Property subject to the Excluded Leases;

(i)    all right, title and interest of the Seller now or hereafter existing, in, to and under all Contracts listed on Schedule Section 2.02(i) (the "**Excluded Contracts**");

(j)    the Permits set forth on Schedule Section 2.02(j) (as such schedule may be modified pursuant to Section 2.05, collectively, the **"Excluded Permits"**);

(k)    any purchase order listed on Schedule Section 2.02(k) (the "**Excluded Purchase Orders**");

(l)    all assets located in the Leased Real Property in Houston, Texas; and

(m)    the Excluded Receivables, as defined herein.

Section 2.03.  *Assumed Liabilities*.  Except for the obligations and Liabilities specifically assumed by Buyer in this Section 2.03, Buyer shall not be deemed to have assumed or agreed to be responsible for the Seller's, or any of its Affiliates', Liabilities, whether or not arising out of the ownership and operation of the Purchased Assets. Upon the terms and subject to the conditions of this Agreement, effective at the time of the Closing, Buyer shall assume, become obligated for, and agree to pay and perform when due, only the following Liabilities (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)    all Liabilities of the Seller arising after the Closing Date under the Assumed Leases and the Assumed Contracts, except to the extent such Liabilities are Excluded Liabilities;

(b)    all Liabilities of any kind or character to the extent resulting from or arising out of or in connection with Buyer's use, operation, possession or ownership of or interest in the Purchased Assets, in each case, following the Closing, except to the extent such Liabilities are Excluded Liabilities; and

(c)    the trade Liabilities listed on Schedule Section 2.03(c).

Section 2.04.  *Excluded Liabilities*.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability of the Seller or any of its Affiliates of whatever nature, whether presently in existence or arising hereafter and whether or not related to the Purchased Assets or

Execution Version

the Business. All such other Liabilities (all such Liabilities not being assumed being herein referred to as the "**Excluded Liabilities**") shall be retained by and remain Liabilities of the Seller. Notwithstanding any provision in this Agreement (including Section 2.02(m)) or any other writing to the contrary, the Excluded Liabilities shall include the following:

(a)     all Liabilities for Taxes (regardless of when assessed) (i) of the Seller, its Affiliates or any of their stockholders (or members) for any Tax period (including any Liability of the Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by Contract or otherwise) or (ii) arising from or attributable to the ownership of the Purchased Assets or the operation of the Business for any Tax period (or portion thereof) ending on or prior to the Closing Date;

(b)     any Liability of the Seller or its Affiliates under any Indebtedness, including Indebtedness owed by the Seller to any direct or indirect Affiliate of the Seller, and any obligations or Liability under debtor in possession financing incurred by the Seller or its Affiliates during the Bankruptcy Case;

(c)     all Workers' Compensation Liabilities and unemployment Liabilities of the Seller existing prior to the Closing that are related to the Purchased Assets, including to and with respect to current employees of the Seller and former employees who worked or who were employed at the Purchased Assets, including any such Workers' Compensation Liabilities and unemployment Liabilities of the Seller with respect to any of its predecessors;

(d)     any Liability with respect to the costs, fees, payments, charges, obligations and expenses of the Seller in connection with, relating to or arising out of the preparation, negotiation, execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby or thereby, including all Taxes;

(e)     any Liability to the extent relating to or arising out of an Excluded Asset, including, without limitation, any performance bond related to any Excluded Contract;

(f)     any Liabilities of the Seller or any of its Affiliates relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders prior to the Closing Date that (subject to the last sentence of Section 7.01(a)) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(g)     any Liabilities arising out of, in respect of or in connection with the failure by the Seller or any of its Affiliates to comply with any Applicable Law or order by any Governmental Authority;

(h)     other than the Assumed Liabilities pursuant to Section 2.03(a), any Liability under the Assumed Contracts and the Assumed Leases arising out of or relating to events, breaches or defaults thereunder occurring on or prior to the Closing Date (excluding all Cure Costs);

(i)        any Liability with respect to any goods sold or any service provided by the Seller or its Affiliates, including any such Liability or obligation (i) pursuant to any express or implied representation, warranty, agreement, specification undertaking or guarantee made by the Seller or any Affiliate of the Seller, or alleged to have been made by the Seller or any Affiliate of the Seller, (ii) imposed or asserted to be imposed by operation of Applicable Law or (iii) pursuant to any doctrine of product liability;

(j)        Any performance bond related thereto any Excluded Purchase Order.

(k)        any Liability with respect to any Action to the extent arising out of or relating to the operation of the Business or pertaining to the Purchased Assets, in each case prior to Closing;

(l)        any Liability (whether arising before, on or after Closing) with respect to any employee or former employee of the Seller or any Affiliate of the Seller (or any individual who applied for employment with the Seller);

(m)        all accrued operating expenses and other current liabilities of the Seller related to the Business, except for the trade liabilities listed on Schedule Section 2.03(c);

(n)        any Liability arising under, relating to or with respect to any employee benefit plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by the Seller or any ERISA Affiliate, or with respect to which the Seller or any ERISA Affiliate has any liability, including with respect to any underfunded pension liability to any employee benefit plan, the PBGC, IRS or Department of Labor or otherwise;

(o)        any Liability arising under, relating to or with respect to any multi-employer pension plan;

(p)        any Liabilities to any current or former employee of the Seller or any of Affiliate or any beneficiary thereof, relating to any employee benefits or compensation arrangement, including any liability for continuation coverage under or pursuant to Parts 6 and 7 of Subtitle B of Title I of ERISA and Section 4980B of the Code ("**COBRA**");

(q)        any Liability under any employment, collective bargaining, severance, retention or termination agreement or arrangement with any employee, consultant or contractor (or its representatives) of the Seller or any of its Affiliates;

(r)        any Liability under or pursuant to the WARN Act;

(s)        any Liabilities pursuant to Environmental Law arising from or related to any use, transportation, release, treatment, storage or disposal of, or human exposure to, Hazardous Materials (the "**Excluded Environmental Liabilities**"); and

(t)        all obligations of the Seller to any broker, finder or agent for any investment banking or brokerage fees, finders' fees or commission relating to the

transactions contemplated by this Agreement or any Transaction Document and any other fees or expenses for which the Seller or its Affiliates are expressly responsible hereunder.

Section 2.05.    *Assignment of Assumed Contracts, Assumed Leases and Rights; Cure Amounts*.

(a)    The Seller shall transfer and assign or cause to be transferred and assigned all Assumed Contracts and Assumed Leases to Buyer, and Buyer shall assume all Assumed Contracts and Assumed Leases from the Seller, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.  Buyer shall use commercially reasonable efforts to comply with all requirements of Section 365 of the Bankruptcy Code necessary to permit such assignment and assumption.  In connection with such assignment and assumption, Buyer shall cure all monetary defaults under such Assumed Contracts and Assumed Leases to the extent required by section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**") at or prior to Closing; provided that any amount of Cure Costs that are disputed as of Closing, or are determined after Closing to be required, shall be paid by Buyer within a reasonable amount of time after such dispute or determination is finally resolved or made.  To the extent any such Assumed Contract does not constitute an executory Contract subject to assumption and assignment under section 365 of the Bankruptcy Code, then the rights and obligations under such Assumed Contracts and Assumed Leases shall be transferred to Buyer as part of the sale of the Purchased Assets with such rights and obligations (excluding all Cure Costs) being expressly assumed by Buyer.

(b)    The Sale Order shall provide, among other things, that, as of and conditioned on the occurrence of the Closing, the Seller shall assign or cause to be assigned to Buyer, free and clear of all Liens, the Assumed Contracts and Assumed Leases, each of which shall be identified by the name and date of the Assumed Contract or Assumed Lease, as applicable (if available), the other party to the Assumed Contract or Assumed Lease, as applicable and the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Assumed Contracts and Assumed Leases.  Such exhibit shall also set forth the amounts necessary to cure any defaults under each of the Assumed Contracts and Assumed Leases as determined by the Seller based on the Seller's books and records or as otherwise determined by the Bankruptcy Court.

(c)    Notwithstanding anything herein to the contrary, to the extent the assignment of any Assumed Contract, Assumed Lease or Transferred Permit is, after giving effect to Sections 363 and 365 of the Bankruptcy Code, not permitted by law or not permitted without the consent of another Person, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement shall not constitute an agreement to assign or an assignment or transfer of the same (each a "**Removed Contract**"), and (subject to Section 7.01) the Seller and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) and, once obtained, such Removed Contract will be assigned and assumed as though it were one of the Assumed Leases, Assumed Contracts

or Transferred Permits, as applicable. These commercially reasonable efforts shall not require any material payment or other material consideration from the Seller or Buyer (other than the Cure Costs, which shall be the responsibility of Buyer), and any such consent shall contain terms and conditions acceptable to the parties hereto. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Removed Contract. If any such consent shall not be obtained, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question, the Seller and Buyer shall, subject to any approval of the Bankruptcy Court that may be required, use commercially reasonable efforts for a reasonable period of time following the Closing to obtain for Buyer the benefits and burdens thereunder; provided that in no event shall Buyer be obligated to accept any amendment to the terms of any Transferred Permit or any additional conditions with respect to any Transferred Permit. These commercially reasonable efforts shall not require any material payment or other material consideration from the Seller or Buyer (other than the Cure Costs, which shall be the responsibility of Buyer). For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Removed Contract.

(d)    Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time in its discretion, at any time prior to the earlier of (x) the date that is two (2) days prior to the Closing Date or (y) the date on which the Bankruptcy Code or the Bankruptcy Court would require a determination to assume or reject such Contract or Lease, amend or revise Schedule Section 2.01(a), Schedule Section 2.01(c), Schedule Section 2.01(m), Schedule Section 2.02(h), Schedule Section 2.02(i), Schedule Section 2.02(j), Schedule Section 2.02(k), or Schedule Section 2.03(c) in order to (i) add any Lease, Contract, other asset, Permit, trade Liability or purchase order, as applicable, to such Schedules; provided that such Lease, Contract, other asset, Permit, trade Liability or purchase order is owned, used or held for use by the Seller or its Affiliates primarily in connection with the Business or the Purchased Assets, or (ii) eliminate any Lease, Contract, other asset, Permit, trade Liability or purchase order, as applicable, from such Schedules. Automatically upon the addition of any Lease, Contract, other asset, Permit or trade Liability to Schedule Section 2.01(a), Schedule Section 2.01(c), Schedule Section 2.01(m), Schedule Section 2.02(h), Schedule Section 2.02(i), Schedule Section 2.02(j), Schedule Section 2.03(c), or Schedule Section 2.02(k), as applicable, by Buyer in accordance with the previous sentence, such Lease shall be an Assumed Lease (if added to Schedule Section 2.01(a)) or an Excluded Lease (if added to Schedule Section 2.02(h)), such Contract shall be an Assumed Contract (if added to Schedule Section 2.01(c)) or an Excluded Contract (if added to Schedule Section 2.02(i)), such other asset shall be a Purchased Asset, such Permit shall be an Excluded Permit, such trade Liability shall be an Assumed Liability, and such purchase order shall be an Exclude Purchase Order, as applicable, for all purposes of this Agreement. Automatically upon the deletion of any Lease, Contract, other asset, Permit or trade liability from Schedule Section 2.01(a), Schedule Section 2.01(c), Schedule Section 2.01(m), Schedule Section 2.02(h), Schedule Section 2.02(i), Schedule Section 2.02(j) or Schedule Section 2.03(c) by Buyer in accordance with the first sentence of this Section 2.05(d), such Lease shall be an Excluded Lease (if deleted from Schedule Section 2.01(a)), provided, that any such Lease deleted from Schedule Section 2.02(h) shall only become an Assumed Lease if such

Lease is added to Schedule Section 2.01(a)), such Contract shall be an Excluded Contract (if deleted from Schedule Section 2.01(c)), provided, that any such Contract deleted from Schedule Section 2.02(i) shall only become an Assumed Contract if such Contract is added to Schedule Section 2.01(c), such other asset shall be an Excluded Asset, such Permit shall be a Transferred Permit, and such trade Liability shall be an Excluded Liability, provided, further, that any purchase order deleted from Schedule Section 2.02(k) shall only become an Assumed Contract if such purchaser order is added to Schedule 2.01(c),  for all purposes of this Agreement.  If any Lease becomes an Assumed Lease or any Contract or purchase order becomes an Assumed Contract pursuant to this Section 2.05, then the Seller shall take such steps as are reasonably necessary to cause such Lease or such Contract, as the case may be, to be assumed and assigned to Buyer as promptly as possible at or following the Closing (subject to any required approvals of the Bankruptcy Court).

Section 2.06.  *Purchase Price*.

On the terms and subject to the conditions set forth in this Agreement, Buyer shall, as consideration for the Purchased Assets, in addition to the assumption by Buyer of the Assumed Liabilities, pay cash to the  Seller  an aggregate amount equal to (i) Eight Million Dollars ($8,000,000.00) less (ii) the Cash Deposit (the "**Cash Consideration**") plus (iii) the Cure Costs (collectively, the "**Purchase Price**").

Section 2.07.  *Closing; Closing Date Computations, Deliveries, Payment*.

(a)    The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Frost Brown Todd LLC, 3300 Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202, as soon as possible, but in no event later than three (3) Business Days, after satisfaction or, to the extent permissible, waiver by the party or parties entitled to the benefit of the conditions set forth in Article 10 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), or at such other time or place as Buyer and the Seller may agree.

(b)    At the Closing:

(i)  The Seller and Buyer shall execute an Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit A</u> (the "**Assignment and Assumption Agreement**"), and, subject to the provisions hereof, the Seller shall deliver to Buyer such deeds (it being understood that all such deeds shall be special warranty deeds), bills of sale, endorsements, title conveyances, consents, assignments and other good and sufficient instruments of conveyance and assignment as the parties and their respective counsel shall deem reasonably necessary to vest in Buyer all right, title and interest in, to and under the Purchased Assets, free and clear of all Liabilities and Liens, other than Assumed Liabilities and Permitted Liens, all of which shall be prepared in accordance with Section 7.07.

**Execution Version**

(ii)    Buyer shall deliver to the Seller:

(A)    the Cash Consideration;

(B)    the Cure Costs subject to Section 2.05 of this Agreement;

(C)    the documents set forth in Section 10.03(c); and

(D)    to the extent not previously delivered, a duly executed counterpart to each Transaction Document to which Buyer is a party and all other documents or instruments required to be delivered by it on or prior to the Closing Date pursuant to this Agreement or to consummate the transactions contemplated by this Agreement, including a new lease agreement on the Leased Real Property located at 1919 W. Polymer Drive, Chattanooga, TN 37421 (the "**Chattanooga Leased Property**").

(iii)    The Seller shall deliver to Buyer:

(A)    the documents set forth in Section 10.02(m); and

(B)    to the extent not previously delivered, a duly executed counterpart to each Transaction Document to which the Seller is a party and all other documents or instruments required to be delivered by them on or prior to the Closing Date pursuant to this Agreement or to consummate the transactions contemplated by this Agreement.; and

Section 2.08. *Withholding*.  The Seller or Buyer, as applicable, shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as the Seller or Buyer are required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If the Seller or Buyer determine that any deduction or withholding is required in respect of any amount otherwise payable pursuant to this Agreement, then the Seller or Buyer, as applicable, shall provide written notice to the Person to receive such payment at least five (5) Business Days prior to the date on which such payment is to be made with a written explanation substantiating the requirement to deduct and withhold, and the Seller or Buyer, as applicable, shall provide such Person the opportunity within such five (5) Business Day period to review and comment on such written explanation and to provide forms or other evidence that would exempt such payment from deduction or withholding. After consultation with the Seller pursuant to the immediately preceding sentence, should Buyer be required by law to deduct or withhold any amount from the consideration otherwise payable pursuant to this Agreement, the Seller shall pay to Buyer a sum in cash equal to the amount so required to be deducted or withheld. In no circumstance shall the consultation requirement restrict the Seller or Buyer from deducting or withholding any amount as required by law.

Section 2.09. *Simultaneous Transactions*.  All actions taken and transactions consummated at the Closing shall be deemed to have occurred simultaneously, and no such transaction shall be considered consummated unless all are consummated.

Section 2.10.  *Supplemental Assignments*. As reasonably required by a party in order to effectuate the transactions contemplated by this Agreement, each party shall also execute and deliver at (and after) the Closing such other assignments, bills of sale, certificates of title and other documents, and shall take such other actions as are necessary or appropriate to transfer the Purchased Assets to Buyer and otherwise implement and make effective the transactions contemplated by this Agreement.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the Disclosure Schedule and subject to Section 12.13, the Seller represents and warrants to Buyer that:

Section 3.01.  *Corporate Existence and Power*.   The Seller is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of formation and has all corporate powers and all governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted, except for those licenses, authorizations, permits, consents and approvals the absence of which would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Purchased Assets, or materially delay or impair any of the transactions contemplated hereby.  The Seller does not have any Subsidiaries or otherwise own securities or other ownership interests in any other Person.

Section 3.02.  *Corporate Authorization*.  The execution, delivery and, subject to the entry of the Sale Order, performance by the Seller of this Agreement and each Transaction Document and the consummation of the transactions contemplated hereby and thereby are within the Seller's powers.   Subject to the entry of the Sale Order, each of this Agreement and the Transaction Documents constitutes a valid and binding agreement of the Seller enforceable against the Seller in accordance with their terms.

Section 3.03.  *Governmental Authorization*.  The execution, delivery and performance by the Seller of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Authority other than (i) the Bankruptcy Court; (ii) the transfer or reissuance of the Transferred Permits; and (iii) any such action or filing as to which the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Purchased Assets, or materially delay or impair any of the transactions contemplated hereby.

Section 3.04.  *Noncontravention*.  After giving effect to the Sale Order, the execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the organizational documents of the Seller, (ii) assuming compliance with the matters referred to in Section 3.03, violate any Applicable Law, (iii) require the consent or other action of any Person under or constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation under any Assumed Contract, Assumed Lease or any other Contract of the Seller or any of its Affiliates, or (iv) result in the creation or imposition of any Lien upon any of the

**Execution Version**

Purchased Assets under any Contract to which the Seller, any of its Affiliates or its or their properties may be bound, with such exceptions, in the case of clauses (iii) and (iv), as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Purchased Assets, or materially delay or impair any of the transactions contemplated hereby.

Section 3.05. *Owned Real Property*.  The Seller does not own any real property.

Section 3.06. *Leases and Leased Real Property*.

(a)  Schedule Section 2.01(a) contains a true and complete list of (x) all the Leases and (y) recording information for the Leases that have been recorded, and the Leases have not been amended or modified, assigned or subleased except as set forth on Schedule Section 2.01(a).  Schedule Section 3.06(a)(i) contains a true and complete list of all prepaid rents for each Lease as of January 15, 2018. The Seller has made available to Buyer a copy of each Lease in the Seller's possession, including all material amendments, schedules and exhibits thereto, and the Seller has no Knowledge that any of such information is incomplete or inaccurate. Each of the Leases is in full force and effect and constitutes a valid and binding obligation of the Seller and the other parties thereto. The leasehold estate created by each Lease is free and clear of all Liens created by, through or under the Seller. Except as disclosed in Schedule Section 3.06(a)(ii), there are no material defaults, breaches or uncured violations by the Seller under any of the Leases, and no event has occurred that (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a material default, breach or uncured violation by the Seller under any Lease, except for any such defaults or breaches that would be cured through payment of the Cure Costs or arose solely as a consequence of the Bankruptcy Case. Except as disclosed in Schedule Section 3.06(a)(ii), there are no material defaults, breaches or uncured violations by any other party, or any events, which with notice, the passage of time or both, would constitute such material defaults, breaches or violations by any other party under any of the Leases. There are no existing disputes between the Seller and any other party to any of the Leases or any party having rights under or with respect to the Leases that are expected to result in a claim of material default or breach or termination thereof, except for any such defaults or breaches that would be cured through payment of the Cure Costs or those arising solely as a consequence of the Bankruptcy Case. The Seller has paid all rent and other payments due and payable under each Lease, and has otherwise complied in all material respects with the Leases, and the Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy any such Purchased Leased Real Property or any portion thereof, except for any such non-payments that would be cured through payment of the Cure Costs. Since January 1, 2014, Seller has not received any written notice that there exists any default, breach, violation or condition which with the passage of time, the giving of notice or both would constitute a default, breach or violation on the part of the Seller under any Lease. Except as disclosed in Schedule Section 3.06(a)(ii) or in connection with the Cure Costs, the Seller has not received any notice in writing, and have no Knowledge, that any lessor or landlord will cancel, terminate, or fail to perform its obligations under the Leases.

(b)  There are no outstanding options or rights of first refusal to purchase or sublease any of the Seller's interest in the Leases or any interest therein.

(c)  The Seller has obtained all material easements and rights of way required to use and operate the Purchased Leased Real Property in all material respects in the manner in which the Purchased Leased Real Property is currently being used and operated. Except as set forth on Schedule Section 3.06(c), since January 1, 2014, the Seller has not received written notice from any Governmental Authority stating an intention to cancel, suspend or modify any material approvals relating to the Purchased Leased Real Property, and no such notice has been received prior to such date that is not resolved in all material respects.

Section 3.07. *Licenses and Permits.*

(a) Schedule Section 3.07(a) (i) describes each license, franchise, permit, certificate, approval or other similar authorization held by the Seller, together with a true and complete list of all pending applications for additional permits, renewals of existing permits or amendments to existing permits, which have been submitted to any Governmental Authority or other entity by the Seller or any of its Affiliates (all such permits being herein referred to as the "**Permits**"), (ii) identifies the applicable bonds, letters of credit or other sources of collateral or financial assurance with respect to each Permit and the amount thereof with respect to each Permit, and (iii) indicates whether each Permit is a Transferred Permit or Excluded Permit.

(b)   The Permits constitute all of the material governmental permits, consents, licenses, approvals, clearances and authorizations necessary for the operation of and the conduct of the Business and the Purchased Assets as presently operated and conducted by the Seller or currently contemplated to be operated and conducted by the Seller within the next six months, and all of the Permits are final, unappealed, valid, in good standing and in full force and effect, except where the failure to be final, unappealed, valid, in good standing and in full force and effect would not reasonably be expected to be material to the Purchased Assets or materially delay or impair any of the transactions contemplated hereby. The Seller and its Affiliates are in material compliance with the Permits. Except as set forth on Schedule Section 3.07(b), no suspension, revocation, cancellation, modification (including revision to effluent limits), or limitation of any of the Permits is threatened or contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals neither the Seller nor any Affiliate of the Seller has reason to believe will not be granted. Neither the Seller nor any Affiliate of the Seller has had any Permits, or any applications therefor, appealed, denied, revoked, restricted or suspended and neither the Seller nor any Affiliate of the Seller is currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits or any of the privileges granted thereunder. Except as set forth on Schedule Section 3.07(b), no non-governmental organization, citizens group or other third party has notified the Seller or any Governmental Authority that it intends to (i) sue the Seller or any Governmental Authority with respect to any existing or pending Permit or (ii) appeal any existing Permit or pending application for a Permit, in each case of clauses (i) and (ii), except for such suits or appeals that are fully resolved without any ongoing obligations or Liabilities or as would not reasonably be expected to be material to the Business or the Purchased Assets.   All applications required to have been filed for the renewal of the Permits identified or required to be identified in Schedule Section 3.07(a) have been duly filed on a timely basis with the

appropriate Governmental Authorities, and all other filings required to have been made with respect to such Permits have been duly made on a timely basis with the appropriate Governmental Authorities.

(c)  Except as set forth on Schedule Section 3.07(c), there are no bonds, letters of credit or other sources of collateral or financial assurance that secure obligations relating to any Purchased Asset.

Section 3.08.  *Environmental*.

(a)  Except as set forth on Schedule Section 3.08(a) and as otherwise would not reasonably be expected to be material to the Purchased Assets or materially delay or impair any of the transactions contemplated hereby: (i) since January 1, 2014, no written notice, order, request for information, complaint or other communication or penalty has been received by the Seller or any of its Affiliates with respect to the compliance of the Purchased Assets with any Environmental Laws or Liability under any Environmental Laws, and there are no Actions (including any water audits) pending or threatened in writing, in each case, that allege a violation by or Liability of, whether assumed contractually or by operation of law, the Purchased Assets of or under any Environmental Law; and (ii) the Purchased Assets are and, since January 1, 2014, have been in compliance with all applicable Environmental Laws.

(b)  Neither the Seller nor any of its Affiliates nor any other Person has released, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on or beneath the Purchased Assets, or from the Purchased Assets into the environment, except for such quantities of Hazardous Materials released, stored, deposited, discharged, buried, dumped or disposed of in the ordinary course of business, in material compliance with Environmental Laws and so as would not reasonably be expected to require any material remediation, investigation or other response action pursuant to Environmental Law.

(c)  Without in any way limiting the generality of the foregoing, (i) other than as may contain substances in quantities not regulated by Environmental Law, all underground storage tanks and the capacity and contents of such tanks, located on any Purchased Asset are specifically identified on Schedule Section 3.08(c), (ii) other than as contained substances in quantities not regulated by Environmental Law, all former underground storage tanks have been removed from or closed in place at the Purchased Assets in compliance with Applicable Law and those removed or closed in place since January 1, 2014, are listed on Schedule Section 3.08(c), (iii) all PCB or items containing PCBs in regulated amounts used or stored on any Purchased Assets are identified on Schedule Section 3.08(c), (iv) with respect to the Purchased Assets, there are no underground injection wells, radioactive materials or septic tanks or waste disposal pits in which any Hazardous Materials have been discharged or disposed, other than as have been used in the ordinary course of business, in compliance in all material respects with all Environmental Laws, and as would not reasonably be expected to require any material remediation or investigation pursuant to Environmental Law and (v) none of the Purchased Assets have any associated acid mine drainage or selenium discharges that

constitutes a violation or could reasonably be expected to give rise to material Liability under Environmental Law.

(d)  Neither the Seller nor any of its Affiliates nor any of the Purchased Assets is subject to, bound by or a party to any consent decrees, decisions, judgments, settlements, consent orders, stipulations, decrees or similar orders issued, entered or executed by a Governmental Authority pursuant to any Environmental Law.

Section 3.09.  *Intellectual Property*.

(a)  Schedule Section 3.09(a) lists all Company Intellectual Property that is either (i) subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction (collectively, "**Intellectual Property Registrations**"), including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing; or (ii) used in or necessary for the Seller's current or planned business or operations. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing.  The Seller has provided Buyer with a true and complete list of all Intellectual Property Registrations.

(b)  The Seller exclusively owns all right, title and interest in and to the Company Intellectual Property, free and clear of Liens.  There are not any restrictions or limitations of the Seller's ability to use the Seller's Intellectual Property, including without limitation, as a result of an agreement with a third party or a settlement of a dispute. To the Seller's Knowledge, no employee or independent contractor of the Seller is a party to a Contract that restricts or limits in any way the scope or type of work in which such employee or contractor may be engaged for the Seller or that requires such employee or contractor to transfer, assign or disclose information concerning his or her work to any Person other than the Seller.  The Seller is in full compliance with all legal requirements applicable to the Company Intellectual Property and the Seller's ownership and use thereof.

(c)  Schedule Section 3.09(c) lists all licenses, sublicenses and other agreements whereby the Seller is granted rights, interests and authority, whether on an exclusive or non-exclusive basis, with respect to any Licensed Intellectual Property that is used in or necessary for the Seller's current or planned business or operations. The Seller has provided Buyer with true and complete copies of all such agreements. All such agreements are valid, binding and enforceable between the Seller and the other parties thereto, and the Seller and such other parties are in full compliance with the terms and conditions of such agreements.

(d)  The Company Intellectual Property and Licensed Intellectual Property are valid and enforceable and neither the validity nor the enforceability of the Company Intellectual Property or the Licensed Intellectual Property (i) has been questioned, (ii) is being questioned, or (iii) is the subject of any threatened or proposed Action.  The Seller

has not received any written notice from any third party challenging the Seller's ownership of the Company Intellectual Property or rights to use the Licensed Intellectual Property. The Company Intellectual Property and Licensed Intellectual Property as currently or formerly owned, licensed or used by the Seller or proposed to be used, and the Seller's conduct of its business as currently and formerly conducted and proposed to be conducted have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person. The Seller has not received any communication, and no Action has been instituted, settled or, to the Seller's Knowledge, threatened that alleges any such infringement, violation or misappropriation, and none of the Company Intellectual Property are subject to any outstanding order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

(e)    Schedule Section 3.09(e) lists all licenses, sublicenses and other agreements pursuant to which the Seller grants rights or authority to any Person with respect to any Company Intellectual Property or Licensed Intellectual Property. The Seller provided Buyer with true and complete copies of all such agreements. All such agreements are valid, binding and enforceable between the Seller and the other parties thereto, and the Seller and such other parties are in full compliance with the terms and conditions of such agreements. To the Seller's Knowledge, no Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Company Intellectual Property.  Other than as set forth in Schedule Section 3.09(e), the Seller has not at any time assigned or otherwise transferred ownership of, or agreed to assign or otherwise transfer ownership of, any Intellectual Property.

(f)    The Company Intellectual Property and Licensed Intellectual Property, together with all other assets of the Seller, are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of the Seller as currently conducted.

(g)    Except as set forth in Schedule Section 3.09(g), the transactions contemplated by this Agreement will not result in the loss of, impairment of, or creation of any Lien on, any of the Company Intellectual Property or the Licensed Intellectual Property.

(h)    The Seller has taken precautions to protect the secrecy, confidentiality and value of the Seller's Intellectual Property used in the conduct of the Business.

(i)    Except as set forth on Schedule Section 3.09(i), no source code for any software owned by the Seller ("**Company Software**") has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee or consultant of the Seller.  The Seller does not have any duty or obligation (whether present, contingent or otherwise) to deliver, license or make available the source code for any Company Software to any escrow agent or other Person who is not, as of the date of this Agreement, an employee or consultant of the Seller.  No event has occurred, and no circumstance or condition exists, that (with or without notice

or lapse of time) will, or could reasonably be expected to, result in the delivery, license or disclosure of any source code for any Company Software to any other Person who is not, as of the date of this Agreement, an employee or consultant of the Seller.

(j)    None of the Seller's Intellectual Property is subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License, Lesser GNU Public License, or Mozilla Public License) that (i) could require, or could condition the use or distribution of such Intellectual Property on, the disclosure, licensing, or distribution of any source code for any portion of such Intellectual Property or (ii) could otherwise impose any limitation, restriction, or condition on the right or ability of the Seller to use or distribute any of the Seller's Intellectual Property, other than any limitation, restriction, or condition generally applicable to ASP software or Microsoft .NET software.

(k)    All Intellectual Property relating to the Business that was created or owned by any current or former employee, officer, director, direct or indirect owner or independent contractor of the Seller has been transferred to the Seller and is Company Intellectual Property, and such Persons have not retained any rights to any Intellectual Property.

(l)    The Seller has all rights in and to all work instructions, drawings, specifications, tools, dies, molds, jigs, fixtures, special tools, special test equipment and the like possessed by any vendors or suppliers of the Seller.  Such vendors and suppliers have rights in such items only to the extent they are using such items on behalf of the Seller, and have no rights to use such items for any other purpose, including for their own benefit or for the benefit of any third party.

(m)    No vendor, supplier or other third party owns or possesses any proprietary rights or products currently used in the business of the Seller that the Buyer will be unable to use following the Closing.

Section 3.10.    *Title to the Purchased Assets*.  The Seller has, and subject to the terms of the Sale Order, upon consummation of the transactions contemplated hereby, including the transfer or reissuance of the Transferred Permits, Buyer will have acquired, good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens except for the Liens set forth on Schedule Section 3.10 (the "**Permitted Liens**").  There are no material unrecorded Liens relating to the Purchased Leased Real Property.

Section 3.11.    *Condition and Sufficiency of Purchased Assets*.  Except as set forth in Schedule Section 3.11, the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing

and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.  None of the Excluded Assets are material to the Business.

Section 3.12.  *Assumed Contracts*.  Schedule Section 2.01(c) sets forth a complete and accurate list of all Assumed Contracts.  The Seller has provided Buyer with copies of each Assumed Contract, including all material amendments, schedules and exhibits thereto, in the Seller's possession, and the Seller has no Knowledge that any of such information provided to Buyer is incomplete or inaccurate. Each Assumed Contract to which the Seller is a party is a valid and binding agreement of the Seller (and of the other party thereto) and is in full force and effect, and neither the Seller nor any other party thereto is in default or breach in any material respect under the terms of any such Assumed Contract, except for any such defaults or breaches that would be cured through payment of the Cure Costs or arose solely as a consequence of the Bankruptcy Case.  There are no events which with notice, the passage of time or both would constitute any such default or breach under any Assumed Contract, except for any such defaults or breaches that will be cured upon payment of the Cure Costs or arise solely as a consequence of the Bankruptcy Case. The Seller has not received any written notice that any of the other parties to the Assumed Contracts will cancel, terminate or fail to perform such party's obligations under any of the Assumed Contracts, except where such cancellation, termination or failure to perform would not reasonably be expected, individually or in the aggregate, to be material to the Business or the Purchased Assets.

Section 3.13.  *Litigation, Investigations and Claims*.  Schedule Section 3.13 sets forth a true, complete and correct list of all existing and pending litigation, arbitration, judgment, court order, decree, injunction, administrative order, claim, dispute, process or other actions against or related to the Purchased Assets.  Except as set forth on Schedule Section 3.13, there is no formal investigation, cessation order or notice of violation or other Action pending or threatened against the Purchased Assets or that, in any case, would reasonably be expected, individually or in the aggregate, to be material to the Purchased Assets or prevent or materially delay or impair the consummation of the transactions contemplated by this Agreement or the Transaction Documents.  The Seller is not in default with respect to any order, writ, injunction, decree or process of any arbitrator or Governmental Authority, which default would prevent or materially delay the consummation of the transactions contemplated by this Agreement or the Transaction Documents.  Except as set forth on Schedule Section 3.13 and except for any order entered by the Bankruptcy Court, there are no facts or circumstances that would reasonably be expected to give rise to any litigation, arbitration, judgment, court order, decree, injunction, administrative order, claim, dispute, process or other actions that, individually or in the aggregate, would reasonably be expected to be material to the Purchased Assets or materially delay or impair any of the transactions contemplated hereby.  For the avoidance of doubt, notwithstanding the inclusion of any litigation, investigations, or claims on Schedule Section 3.13, Buyer is purchasing the Purchased Assets under, *inter alia*, the provisions of 11 U.S.C. § 362(f), free and clear of any interest in the Purchased Assets of any other entity, including those listed in Schedule Section 3.13.

Section 3.14  *Warranty and Product Liability.*  Schedule Section 3.14 sets forth a true, correct and complete list of (a) any and all material actual or, to the Knowledge of the Seller, potential claims currently or since December 7, 2015, outstanding, pending or, to the Knowledge of the Seller, threatened by a Governmental Authority or any private litigant involving a service

provided or a product designed, manufactured, serviced, produced, modified, distributed or sold by or on behalf of the Seller relating to an alleged defect in design, manufacture, materials or workmanship, performance, or alleged failure to warn, or an alleged breach of any guarantee or warranties or representations, other than notices or claims that have been settled or resolved prior to the date of this Agreement or that are within normal warranty experience or those that would not reasonably be expected, individually or in the aggregate, to be material to the Seller and (b) to the Knowledge of the Seller, and as except set forth on Schedule Section 3.14, any and all material design defects with respect to any of the products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Seller, whether work in progress or in final form, other than those that would not reasonably be expected, individually or in the aggregate, to be material to the Seller.  For the avoidance of doubt, notwithstanding the inclusion of any potential warranty or product liability claims listed on Schedule Section 3.14, Buyer is purchasing the Purchased Assets under, *inter alia*, the provisions of 11 U.S.C. § 362(f), free and clear of any interest in the Purchased Assets of any other entity, including those listed in Schedule Section 3.14.

Section 3.15 *Customers and Suppliers*.  Schedule Section 3.15(a) contains a true, correct and complete list of the customers accounting for the top 90% of revenue of the Seller in either or both of the 2016 and 2017 calendar years (the "**Top Customers")** and Schedule Section 3.15(b) contains a true, correct and complete list of suppliers deemed to be "critical vendors" by the Seller pursuant to an order entered by the Bankruptcy Court approving the Seller's Emergency Motion for Order Authorizing the Debtor to Pay Pre-Petition Obligations Due to Certain Critical Vendors filed in the Bankruptcy Case and those suppliers that were paid or are owed by Seller and/or its Affiliates an aggregate amount in excess of $100,000 during the 2016 or 2017 calendar year (collectively, the "**Top Suppliers**") (in each case, determined on a consolidated basis based on, in the case of customers, the amount of revenues recognized by the Seller). Schedule Section 3.15(c) contains a true, correct and complete list, to the Knowledge of the Seller, of any and all occurrences since January 1, 2016, where the Seller received any written or other indication that (a) any Top Customer or Top Supplier plans to stop or materially decrease the amount of business done with the Seller, (b) any Top Customer received a material decrease in the prices paid to the Seller that is inconsistent with the terms of its existing agreement or order with the Seller or (c) any Top Supplier received a material increase in the prices charged to the Seller that is inconsistent with the terms of its existing supply agreement with the Seller.  In addition, except as set forth on Schedule Section 3.15(c), the Seller is not involved with any material claim or dispute greater than $50,000.00 in aggregate for a twelve-month period with respect to any Top Customer or with any Top Supplier.

Section 3.16 *Accounts Receivable*.  The accounts receivable reflected on the Seller's most recent balance sheet and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by the Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of the Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) are collectible within 90 days after the billing date assuming that, after the Closing, Buyer continues in a manner consistent with past practices the Seller's performance of contractual obligations, collection efforts and customer relationship management.

**Execution Version**

Section 3.17 *Inventory*.    All Inventory, whether or not reflected in the Seller's most recent balance sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, subject to any reserve set forth in the such balance sheet, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All Inventory has been valued at the lower of cost or net realizable value on a first in, first out basis. No Inventory is held on a consignment basis. The quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances.

Section 3.18 *Taxes*.

(a)    *Tax Returns and Payment of Taxes*. The Seller has duly and timely filed or caused to be filed (taking into account any valid extensions) all material Tax Returns required to be filed by it. Such Tax Returns are true, complete, and correct in all material respects. The Seller is not currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business consistent with past practice. All material Taxes due and owing by the Seller (whether or not shown on any Tax Return) have been timely paid or, where payment is not yet due, the Seller has made an adequate provision for such Taxes in the Seller's financial statements (in accordance with GAAP). The Seller's most recent financial statements reflect an adequate reserve (in accordance with GAAP) for all material Taxes payable by the Seller through the date of such financial statements. The Seller has not incurred any material Liability for Taxes since the date of the Seller's most recent financial statements outside of the ordinary course of business or otherwise inconsistent with past practice.

(b)    *Availability of Tax Returns*. The Seller has made available to Buyer complete and accurate copies of all federal, state, local, and foreign income, franchise, and other material Tax Returns filed by or on behalf of the Seller for any Tax period ending after December 7, 2014.

(c)    *Withholding*. The Seller has withheld and timely paid each material Tax required to have been withheld and paid in connection with amounts paid or owing to any Business Employee, former Business Employee, creditor, customer, shareholder, or other party, and materially complied with all information reporting and backup withholding provisions of Applicable Law.

(d)    *Liens*. There are no Liens for material Taxes upon the assets of the Seller other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP has been made in the Seller's most recent financial statements.

(e)    *Tax Deficiencies and Audits*. No deficiency for any material amount of Taxes which has been proposed, asserted, or assessed in writing by any taxing authority against the Seller remains unpaid. There are no waivers or extensions of any statute of limitations currently in effect with respect to Taxes of the Seller. There are no audits, suits, proceedings, investigations, claims, examinations, or other administrative or judicial proceedings ongoing or pending with respect to any material Taxes of the Seller.

Execution Version

(f)    *Tax Jurisdictions*. No claim has ever been made in writing by any taxing authority in a jurisdiction where the Seller does not file Tax Returns that the Seller is or may be subject to Tax in that jurisdiction.

(g)    *Tax Rulings*. The Seller has not requested and is not the subject of or bound by any private letter ruling, technical advice memorandum, or similar ruling or memorandum with any taxing authority with respect to any material Taxes, nor is any such request outstanding.

(h)    *Consolidated Groups, Transferee Liability, and Tax Agreements*. The Seller: (i) has not been a member of a group filing Tax Returns on a consolidated, combined, unitary, or similar basis; (ii) has no material liability for Taxes of any Person (other than the Seller) under Treasury Regulation Section 1.1502-6 (or any comparable provision of local, state, or foreign law), as a transferee or successor, by Contract, or otherwise; and (iii) is not a party to, bound by or has any material liability under any Tax sharing, allocation, or indemnification agreement or arrangement.

(i)    *Change in Accounting Method*. The Seller has not agreed to make, and is not required to make, any material adjustment under Section 481(a) of the Code or any comparable provision of state, local, or foreign Applicable Law by reason of a change in accounting method or otherwise.

(j)    *Post-Closing Tax Items*. The Seller will not be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of Applicable Law) executed on or prior to the Closing Date; (ii) installment sale or open transaction disposition made on or prior to the Closing Date; (iii) prepaid amount received on or prior to the Closing Date; or (iv) election under Section 108(i) of the Code.

(k)    *Ownership Changes*. Without regard to this Agreement, the Seller has not undergone an "ownership change" within the meaning of Section 382 of the Code.

(l)    *Section 355*. The Seller has not been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code.

(m)    *Reportable Transactions*. The Seller has not been a party to, or a material advisor with respect to, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

Section 3.19.  *Laws and Regulations*.  The Seller is in compliance in all material respects with all Applicable Laws relating to the Purchased Assets, except (i) as explicitly disclosed in Schedule Section 3.19 or (ii) for violations that have not had and would not reasonably be expected to have a materially adverse impact upon the Purchased Assets, taken as a whole, or to prevent, hinder or delay the consummation of the transactions contemplated by this Agreement or any of the Transaction Documents.

Section 3.20.  *Finders' Fees*. Except as set forth on Schedule Section 3.20, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.21.  *Full Disclosure*.  No representation or warranty by the Seller in this Agreement and no statement contained in the Disclosure Schedule to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Disclosure Schedule and subject to Section 12.13, Buyer represents and warrants to the Seller that:

Section 4.01.  *Corporate Existence and Power*.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and has all limited liability company powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02.  *Limited Liability Company Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby are within the limited liability company powers of Buyer and have been duly authorized by all necessary limited liability company action on the part of Buyer.  Subject to the entry of the Sale Order, this Agreement constitutes, and the Transaction Documents to which Buyer is a party, when executed and delivered by Buyer will constitute, the valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and general principles of equity that restrict the availability of equitable remedies.

Section 4.03.  *Governmental Authorization.*  The execution, delivery and performance by Buyer of this Agreement and each of the Transaction Documents and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or material filing with, any Governmental Authority other than (i) the Bankruptcy Court and (ii) the transfer or reissuance of the Transferred Permits.

Section 4.04.  *Noncontravention*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the organizational documents of Buyer, (ii) assuming compliance with the matters referred to in Section 4.03, violate any Applicable Law or (iii) require any consent or other action by any Person under, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit to which Buyer

is entitled under any provision of any agreement or other instrument binding upon Buyer, except, in the case of this clause (iii), as would not reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated in this Agreement and, in each case, after giving effect to the Sale Order.

Section 4.05.  *Financial Capability*.  Buyer has, or will have prior to the Closing, sufficient cash, available lines of credit or other sources of immediately available funds to enable it to consummate the transactions contemplated by this Agreement.

Section 4.06.  *Litigation*.  There is no action, suit, investigation or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

Section 4.07.  *Finders' Fees*.  Except as otherwise disclosed herein, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

ARTICLE 5
COVENANTS OF THE SELLER

The Seller agrees that:

Section 5.01.  *Conduct of the Business*.  Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case (*provided* that the Seller shall (x) not, without the prior written consent of Buyer, seek any order of the Bankruptcy Court in the Bankruptcy Case requiring them to refrain from taking any actions described in this Section 5.01 and (y) use its commercially reasonable efforts to oppose any motion or other request seeking such an order of the Bankruptcy Court) or other Applicable Law, from the date hereof until the Closing Date, the Seller shall use its commercially reasonable efforts to:

    (a)   conduct the Business in the ordinary course consistent with past practice;

    (b)   maintain the Purchased Assets in as good working order and condition as at present, ordinary wear and tear excepted;

    (c)   keep in full force its existing insurance policies coverage amounts without being in default or failing to give any notice of any potential or present claim thereunder;

    (d)   keep in full force and effect the Transferred Permits;

    (e)   keep available the services of the present employees and vendors of the Business (except as otherwise agreed to by Buyer and Seller); and

(f)   maintain and preserve intact the business organizations of the Business and maintain all of its existing business relationships and contracts with third parties, including, without limitation, its customers, suppliers and landlords.

For the avoidance of doubt, the pendency of the Bankruptcy Case and the effects thereof shall in no way be deemed a breach of this Section 5.01.

Section 5.02.  *No Changes in Business*.  Without limiting the generality of Section 5.01, from the date of this Agreement through the Closing, except as expressly permitted by this Agreement or as consented to by Buyer in writing (which consent shall not be unreasonably withheld, conditioned or delayed) and to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case (provided the Seller shall (x) not, without the prior written consent of Buyer, seek any order of the Bankruptcy Court compelling them to take any action described in this Section 5.02 and (y) use its commercially reasonable efforts to oppose any motion or other request seeking such an order of the Bankruptcy Court) or other Applicable Law, the Seller shall not, and shall not permit any of its Affiliates to, with respect to the Business:

(a)   reject, pursuant to Section 365 of the Bankruptcy Code, any Assumed Contract or Assumed Lease;

(b)   enter into any material Contract;

(c)   amend its Governing Documents;

(d)   amend or otherwise modify any Assumed Contract or incur or agree to incur any Liability except for non-material Contracts in the ordinary course of business (any Contract having a value of $5,000 or less will be considered non-material);

(e)   grant a security interest in, mortgage, pledge or otherwise encumber or subject to a Lien any Purchased Asset;

(f)   incur any Indebtedness, except as provided in the Interim DIP Order as it may be amended from time to time, or assume, guarantee or endorse the obligations of any Person, in each case other than Indebtedness or assumptions, guarantees or endorsements of obligations of any Person that do not constitute Assumed Liabilities;

(g)   waive, release, assign, settle or compromise any material rights, claims, litigations or arbitrations that constitute Purchased Assets;

(h)   enter into any Contract which materially restricts the ability of the Business to engage in any business in any geographic area or channel of distribution;

(i)   sell, assign, lease (including lease or sublease) or otherwise transfer or dispose of any of the Purchased Assets, without the consent of Buyer which shall not be unreasonably withheld;

(j)    make loans or advances to, guarantees for the benefit of, or any investments in, any Person other than to the extent such loans, advances guarantees or investments do not constitute Purchased Assets or Assumed Liabilities, as the case may be;

(k)    make, change or revoke any material Tax election, settle or compromise any material Liability for Taxes, file any materially amended Tax Return, or enter into any material agreement with respect to Taxes, in each case to the extent such action would adversely affect the Purchased Assets or the Business, or subject Buyer or any of its Affiliates to any Tax Liability, after the Closing Date;

(l)    enter into or amend any Contract or commitment, or enter into any other transaction, directly or indirectly, with the Seller or any Affiliate that constitutes an Assumed Contract or gives rise to an Assumed Liability;

(m)    enter or commit to enter into any collective bargaining agreement or other labor agreement with any union or other labor organization;

(n)    (i) waive, release, assign, settle or compromise any rights or claims pursuant to and under any Accounts Receivable, (ii) make any material change in accounting practices, billing or cash management practices with respect to the timing and frequency of collection of receivables, or (iii) shorten or lengthen the customary collection cycles for any Accounts Receivable, in each case, except in the ordinary course of business and in a manner consistent with past practices;

(o)    take any action or omit to take any action that is reasonably likely to result in any of the conditions set forth in Article 10 not being satisfied; or

(p)    agree or commit to do any of the foregoing.

Section 5.03.  *Access to Information*.  (a) From the date hereof until the Closing Date, the Seller will (i) give Buyer, its counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of the Seller relating to the Business and the Purchased Assets, (ii) furnish to Buyer, its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to the Business and the Purchased Assets as such Persons may reasonably request and (iii) instruct the employees, counsel and financial advisors of the Seller to cooperate with Buyer in its investigation of the Business and the Purchased Assets.  Any investigation by Buyer or its authorized representatives pursuant to this Section shall be conducted in accordance with Applicable Law and in such manner as not to interfere unreasonably with the conduct of the business of the Seller.  Notwithstanding the foregoing, Buyer shall not (A) have access to personnel records of the Seller relating to medical histories or other information which in the Seller's good faith opinion is sensitive or the disclosure of which could subject the Seller to risk of Liability or (B) without the prior written consent of the Seller (not to be unreasonably withheld, conditioned or delayed), conduct or cause to be conducted any sampling, testing or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Business or the Purchased Assets.

**Execution Version**

Any access or investigation by Buyer or its authorized representatives pursuant to this Section shall be at Buyer's sole cost and expense.

Section 5.04. *Release; Acknowledgements*.[2]

(a)  Notwithstanding anything to the contrary contained herein, effective as of the Closing, (i) the Seller (individually and on behalf of its Affiliates) hereby releases and forever discharges the  Buyer and its Affiliates and their respective successors and assigns and all officers, directors, partners, members, equity holders, shareholders, employees and agents of each of them   from any and all actual or potential claims, causes of action, proceedings, Liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such party had, has, or may have in the future to the extent relating to the Excluded Assets or the Excluded Liabilities and (ii) Buyer (individually and on behalf of its Affiliates) hereby releases and forever discharges the Seller and its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, Liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such party had, has or may have in the future to the extent relating to the Purchased Assets or the Assumed Liabilities; *provided* that nothing in this Agreement (including this Section 5.04) shall (x) constitute a release of any Person arising from conduct of such Person that is determined by a final order of a court of competent jurisdiction to have constituted fraud, willful breach, knowing and intentional misrepresentation or criminal act by such Person, (y) be construed to release any Person from any of its contractual obligations under this Agreement and the Transaction Documents, including its obligations in respect of the Purchased Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, each of which shall remain fully effective and enforceable from and after the Closing Date and (z) constitute a release by Buyer or any of its Affiliates of any claims that Buyer or any of its Affiliates have in the Bankruptcy.

(b)  Subject to Section 12.05, the Seller acknowledges that Buyer is the sole Person bound by, or liable with respect to, the Liabilities of Buyer under this Agreement, and that no Affiliate of Buyer or any current or former shareholder, partner, member, controlling Person, agent, officer, director, employee, counsel, accountant, advisor, agent, consultant, or other representative of Buyer shall be bound by, or liable with respect to, any aspect of this Agreement or any of the transactions contemplated hereby.

Section 5.05 *Competing Bid*.

---

[2] For the avoidance of doubt, for purposes of this Section 5.04, the term "Affiliates" includes Lectrus Holdings Corp., parent of the Seller.

This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions) (an "**Alternative Transaction**") involving the direct or indirect sale, lease, transfer or other disposition of any assets of the Seller to a purchaser or purchasers other than Buyer (whether consummated pursuant to a sale, merger, consolidation, tender offer, share exchange, consensual foreclosure, liquidation, credit bid, chapter 11 plan, or otherwise, a "**Competing Bid**").

Nothing contained herein shall be construed to prohibit the Seller and its representatives or Affiliates from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bid other than as set forth in the Bidding Procedures Order.

Section 5.06 *Cooperation in Bankruptcy Court Matters*.

The Seller shall pursue diligently the entry of the Sale Order. The Seller shall use commercially reasonable efforts to comply with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules in connection with obtaining approval of the Bidding Procedures Order.

Section 5.07 *Sale Order*.

(a) The Seller shall file with the Bankruptcy Court a proposed Sale Order providing for approval of this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof. The Seller shall deliver to Buyer as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, a draft of such proposed Sale Order, or if applicable, the filed proposed Sale Order. The Sale Order shall be reasonably acceptable to Buyer.

(b) The Sale Order shall contain, without limitation, the following provisions:

(i) finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that the Seller and Buyer entered into this Agreement in good faith, the Purchase Price and liabilities of the Seller under the Assumed Contracts constitute fair value in consideration for the Purchased Assets and determining that Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Purchased Assets;

(ii) authorizing the Seller to transfer to Buyer all its rights, title, privileges and interests in and to the Purchased Assets, and ordering that such transfer is free and clear of any Liens, with all such Liens attaching to the net proceeds of sale, if any;

(iii) authorizing the Seller to assume and sell and assign the Assumed Contracts to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code;

(iv) finding that Buyer is a not a successor to the Seller or its estate by reason of any theory of law or equity, whether with respect to any Liens and claims against the Seller, the Purchased Assets or otherwise and ruling that Buyer shall not be subject to successor liabilities for products sold prior to the Closing, all as set forth in more detail in the form of Sale Order attached hereto as Exhibit B; and

(v) Cure Costs shall otherwise be those determined by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code with respect to the Assumed Contracts.

(c) Subject to any Competing Bid, (i) the Seller agrees that it will promptly take such actions as are reasonably necessary or appropriate to obtain prompt entry of the Sale Order, (ii) Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller and are reasonably necessary or appropriate to assist the Seller in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court or live testimony for the purposes of, among other things, providing necessary assurances of future performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code; and (iii) if the entry of the Sale Order shall be appealed or collaterally attacked, the Seller and Buyer shall use their respective reasonable efforts to defend such appeal or collateral attack of the Sale Order after its entry; provided, that Buyer shall reimburse to the Seller the costs and expenses (including professional fees and expenses) of the Seller in any such appeal. After consultation with Buyer, in the Seller's sole discretion, the Seller may respond to objections to the entry of the Sale Order, conduct discovery proceedings, schedule and attend hearings and oppose any actions taken by the parties objecting to, appealing, or seeking a stay of the consummation of the sale of the Purchased Assets provided by this Agreement.  The Seller shall use commercially reasonable efforts to take all actions, including the defense of motions and actions filed by third parties required in the Bankruptcy Case reasonably required to retain possession and ownership of the Purchased Assets pending the Closing; provided, however, the Seller's obligations in connection with any such efforts shall terminate upon the Closing.

(d) If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed or petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto, the Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts.

Section 5.08  *Additional Bankruptcy Matters*.

(a)    From and after the date of this Agreement and until the Closing Date, to the extent reasonably practicable, the Seller shall deliver to Buyer drafts of any and all pleadings, motions, notices, statements, applications, schedules, reports, and other papers to be filed or submitted by the Seller in connection with or related to this Agreement for Buyer's prior review. The Seller shall make reasonable efforts to consult and cooperate with Buyer regarding (i) any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers, any discovery taken in connection with seeking entry of the Sale Order (including any depositions) and (ii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses' testimony, in connection with such hearing.

(b)    The Seller acknowledges and agrees, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Liens of, against or created by the Seller or its bankruptcy estate, shall be fully released from and with respect to the Purchased Assets, which shall be transferred to Buyer free and clear of all Liabilities and Liens, except for Assumed Liabilities and Permitted Liens.

Section 5.09.   *Payment of Cure Costs*.   On the Closing, Buyer shall pay in full in cash to the applicable counterparty the undisputed Cure Costs with respect to each Assumed Contract and Assumed Lease, subject to Section 2.05 of this Agreement. In the event of a dispute over any Cure Cost, such disputed Cure Cost shall be placed into a segregated account for later determination by the Bankruptcy Court.

Section 5.10.   *Insurance*. The Seller shall use commercially reasonable efforts, after the Closing, to (i) enable Buyer and its Affiliates to file, notice and otherwise continue to pursue (or, at the direction and expense of Buyer, shall file, notice and continue to pursue) any claims on behalf of the Business or the Purchased Assets under any third party insurance policy of the Seller covering the Business or any Purchased Asset for events occurring prior to the Closing, and (ii) enable Buyer and its Affiliates to recover proceeds under the terms thereof.

Section 5.11  *Change and Assignment of Name of Seller*.  As soon as practicable after the Closing, but in any event no later than two (2) Business Days after the Closing Date, Seller shall make all necessary filings to change its legal name and any fictitious name registered with any applicable Governmental Authority and, to the extent allowed by Applicable Law, shall assign the name "Lectrus" to Buyer.  Effective as of the Closing Date, to the extent allowed by Applicable Law, Seller shall not (and shall not permit its Affiliates to) use the name "Lectrus" or any similar name or any logo, trade dress, trade name, trademark, service mark or the like similar to or confusing therewith for any business purpose or otherwise; provided that, to the extent necessary to fulfill its obligations hereunder and under the Sale Order or other Applicable Law, Seller shall be permitted to append the phrase "formerly known as 'Lectrus'" (or any iteration of such phrase) to the name with which it holds itself out to the public from and after the Closing Date.

Section 5.12  *Receivables*.  Seller hereby agrees and acknowledges that any and all payments in respect of the Receivables that are Purchased Assets and that are received by Seller after the Closing shall be held in trust for the benefit of Buyer and delivered to Buyer as soon as practicable.  Seller agrees to use its good faith, commercially reasonable efforts to assist Buyer in collecting all Receivables relating to the Business included in the Purchased Assets.  Seller shall permit Buyer to reasonably inspect its books and records to confirm compliance with this Section 5.12.  Buyer hereby agrees to use its good faith, commercially reasonable efforts to assist Seller in collecting all Excluded Receivables after Closing.

Section 5.13  *Payment of Excluded Liabilities*. Seller shall pay and discharge all of the Excluded Liabilities promptly as they become due.  In connection with the foregoing, Seller may retain copies of certain financial records as identified in Section 2.01(i) to promptly and properly discharge such liabilities, to comply with the terms of this Agreement, and to otherwise dissolve Seller after the Closing, provided, that Seller shall not be dissolved unless and until all obligations of Seller under this Agreement have been performed.  To  the extent that Seller so fails to pay and discharge all such Excluded Liabilities on a timely basis as they come due, Buyer shall have the right to pay and discharge such liabilities if reasonably necessary to the maintenance of the Business or its reputation and/or relationships, as reasonably determined by Buyer, and shall be reimbursed for all such payments by Seller.

Section 5.14  *Termination of Restrictive Covenant Agreements*.  At Buyer's sole option, Seller shall, as of the Closing Date, either (i) terminate any non-compete, non-solicitation and/or restrictive covenant agreements and arrangements of any personnel who are retained by Buyer or its Affiliates with Seller or (ii)  assign any such non-compete, non-solicitation and/or restrictive agreements and arrangements to Buyer, and Seller shall provide notice of such termination or assignment to such personnel.  All non-competition, non-solicitation and/or restrictive covenant agreements and arrangements between Seller and (i) any of its employees who are not retained by Buyer or its Affiliates or (ii) former employees who remain subject to such agreements or arrangements as of the Closing are hereby assigned to Buyer, to the extent assignable.  To the extent (and only to the extent) of benefit and not of burden to Buyer, and to the extent assignable, all invention assignments and work-made-for-hire provisions regarding Seller arising by operation of law or contract with respect to the relationship between Seller and any of its employees or independent contractors are hereby assigned by Seller to Buyer.  To the extent that any such non-competition, non-solicitation and/or restrictive covenant agreements and arrangements and any such invention assignments and work-made-for-hire provisions are not assignable, Seller shall use commercially reasonable efforts to enforce such agreements or provisions on behalf of Buyer at Buyer's sole expense or otherwise assign to Buyer its "chose in action" related to such agreements or provisions.

Section 5.15  *Non-Competition; Non-Solicitation*.  Seller acknowledges that it is familiar with the trade secrets and other confidential information of Seller, and that the Business is reasonably expected to operate throughout Tennessee (the "**Restricted Territory**").  Therefore, Seller agrees to the covenants set forth in this Section 5.15 and acknowledges that Buyer would not have entered into this Agreement but for Seller's agreement to the restrictions set forth in this Section 5.15.

**Execution Version**

(a)    For a period equal to five (5) years from and after the Closing Date (the "**Restricted Period**"), no Seller or Affiliate of Seller (each, a "**Restricted Seller Party**") shall, directly or indirectly, own, operate, lease, manage, control, engage in, invest in, lend to, own any debt or equity security or interest of, permit its name to be used by, act as a director, manager, partner, consultant, or advisor to, render services for or to (alone or in association with any Person), or otherwise participate or assist any Person other than Buyer in any manner in any business that is engaged in the Business anywhere in the Restricted Territory (the "**Restricted Business**"); provided, however, that nothing in this Agreement shall prohibit a Restricted Seller Party from holding a passive beneficial ownership interest of less than two percent (2%) of the outstanding publicly traded equity securities or interests of any entity.

(b)    During the Restricted Period, the Restricted Seller Parties shall not, and shall cause their controlled Affiliates not to, anywhere in the Restricted Territory:

(i)    directly or indirectly, hire, engage, or solicit for employment (or engagement as a consultant) any person who (A) was employed (or engaged as a consultant) by Seller during the six (6) months prior to Closing, or (B) becomes a Hired Employee in connection with this Agreement or is or was employed (or engaged as a consultant) by Buyer or its Affiliates in connection with the Business, or encourage or induce or attempt to encourage or induce any such Person to leave such employment or engagement; provided that this subsection (i) shall not (A) limit general advertising not specifically directed at any such Person, (B) prohibit soliciting, recruiting or hiring any employee (including any Hired Employee) or consultant whose employment or engagement has been terminated for more than six (6) months by Buyer or its applicable Affiliate or (C) prohibit soliciting, hiring or engaging  (x) any legal counsel or (y) any bona fide firm for providing financial, accounting, tax, or investment banking services (other than for the purpose of evading the foregoing restrictions);

(ii)    encourage or induce or attempt to encourage or induce any Person who is or was within two (2) years prior to the date thereof a customer, supplier, licensee, licensor, franchisee, or other business relation of any of Seller or  Buyer or Buyer's Affiliates (such customers, suppliers, licensees, licensors, franchisees or other business relations, collectively, the "**Company Parties**") to cease doing business or modify the way it does business with Buyer or its Affiliates with respect to the Business, or in any way interfere with or otherwise affect the relationship between any such Company Party and Buyer or its Affiliates with respect to the Business; or

(iii)    solicit any Company Party for a business competitive with the Restricted Business.

(c)    The Restricted Period shall be tolled upon the breach by any Restricted Seller Party of the provisions of this Section 5.15 and shall remain tolled for the amount of time that such Restricted Seller Party continues to be in breach of such provisions; provided, however, that any such tolling shall only commence upon the entry of a final, non-appealable judgment or injunction of a court finding such breach; provided, further, that upon the entry of a final, non-appealable judgment or injunction, the tolling period

shall be calculated as of the date of such breach (and not, for the avoidance of doubt, as of the date of such final, non-appealable judgment or injunction).

## ARTICLE 6
### COVENANTS OF BUYER

Buyer agrees that:

Section 6.01. *Access*. On and after the Closing Date, to the extent permitted by Applicable Law, Buyer will afford promptly to the Seller and its agents reasonable access to its properties, books, records, employees and auditors to the extent necessary in order to facilitate the resolution of any claims made against or incurred by the Seller relating to any period ending on or before the Closing Date; *provided* that any such access by the Seller shall not unreasonably interfere with the conduct of the business of Buyer; *provided further* that the scope of any such access shall be limited to the Purchased Assets.

Section 6.02. *Bankruptcy Actions*. Buyer acknowledges that it must provide adequate assurance of future performance under the Assumed Contracts and agrees that it shall, and shall cause its Affiliates to, cooperate with the Seller in connection with furnishing information or documents to the Seller to satisfy the requirements of section 365(f)(2)(B) of the Bankruptcy Code.

## ARTICLE 7
### COVENANTS OF BUYER AND THE SELLER

Buyer and the Seller agree that:

Section 7.01. *Further Assurance*.

(a) Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, the Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement, in each case, after giving effect to the Sale Order. The Seller and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to use commercially reasonable efforts to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, to vest in Buyer good title to the Purchased Assets and to assure and evidence the assumption by Buyer of the Assumed Liabilities.

(b)   Neither party shall agree (or permit any of their respective Affiliates to agree) to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the consummation of the transactions contemplated by this Agreement unless it consults with the other party in advance (to the extent reasonably practicable to do so) and, to the extent permitted by such Governmental Authority and any Applicable Law, gives the other party and its outside counsel the opportunity to attend and participate at such meeting.

(c)   Notwithstanding anything in this Agreement to the contrary, "commercially reasonable efforts" for purposes of this Agreement shall in no event or circumstance require Buyer or any of its Affiliates, or permit the Seller or any of its Affiliates without Buyer's consent, to (i) execute any settlements, undertakings, consent decrees, stipulations or other agreements, (ii) accept any material amendment to the terms of any Transferred Permit or any additional material conditions with respect to any Transferred Permit or (iii) subject to Section 7.01(d), make to any Person any material payment with respect to obtaining any approvals, consents, registrations, permits, authorizations and other confirmations.

(d)   The fees and expenses for all filings or submissions to any Governmental Authority pursuant to this Section 7.01 shall be borne in full by Buyer.

Section 7.02.   *Certain Filings*.  The Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03.   *Public Announcements*.  Except as may be necessary in connection with the Bankruptcy Case, the parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public statements the making of which may be required by Applicable Law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

Section 7.04.   *Notification of Certain Events*.  Each party shall promptly notify the other of any event, condition or circumstance of which such party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement).  During the period prior to the Closing Date, each party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.  A party's receipt of information pursuant to this Section 7.04 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the other parties in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedule.

**Execution Version**

Section 7.05.  *Bankruptcy Court Approval*.  The Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  The Seller and Buyer shall cooperate with each other in seeking entry of the Sale Order.  Buyer agrees that it will promptly take all actions that are reasonably requested by the Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order.  Notwithstanding any provision in this Agreement or any other writing to the contrary, the Seller is permitted to respond to, and supply information regarding the Business and the Purchased Assets with respect to, any inquiry submitted by any potential counterparty to an Alternative Transaction. The Seller shall contemporaneously provide to Buyer any such information not previously provided to Buyer.

Section 7.06.  *Consents and Approvals*.  Subject to Section 7.01, the parties hereto shall use commercially reasonable efforts, as set forth in this Agreement, to secure all approvals, authorizations, consents, Transferred Permits, orders, licenses, assignments, releases, and/or waivers, if any, that are necessary to effect the transactions contemplated by this Agreement and the Transaction Documents. Without limiting Section 7.01(c), such commercially reasonable efforts shall not require any material payment or other consideration from the parties (other than (i) the Cure Costs and (ii) the Transfer Taxes, which shall be the responsibility of the Seller).

Section 7.07 *Transaction Documents*.  The parties hereto shall negotiate in good faith, prior to Closing, the terms of the Transaction Documents, and in each case such terms shall be in a form (i) customary for transactions of the type contemplated by this Agreement, (ii) consistent with the terms attached as an exhibit to this Agreement (with respect to those Transaction Documents for which an exhibit has been attached hereto), and (iii) reasonably satisfactory to Buyer and the Seller in their respective discretion.

ARTICLE 8
TAX MATTERS

Section 8.01.  *Tax Cooperation; Responsibility for Taxes; FIRPTA.*

(a)     Buyer and the Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets and Assumed Liabilities (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets and the Assumed Liabilities for any Pre-Closing Tax Period for a period of at least six (6) years following the Closing Date. The Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets, the Assumed Liabilities or the Business. The Seller shall use commercially reasonable efforts to provide Buyer with such information that is in the Seller's possession and is reasonably requested by Buyer to identify the jurisdictions in which Tax Returns are required to be filed, or Taxes are required to be paid, and the types of Tax Returns required to be filed, in each case with respect to the Business or the Purchased Assets.

(b)     All excise, sales, use, value added, registration, stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and other similar non-income Taxes, levies, charges and fees incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**") shall be borne by Seller. Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by Applicable Law. Buyer and the Seller shall cooperate in reducing any such Transfer Taxes (and any other Tax cost) to the extent possible, including by providing each other with any appropriate resale exemption certifications and other similar documentation or by restructuring the form of all (or part) of the transactions contemplated by this Agreement and the Transaction Documents; provided that such restructuring is not reasonably expected to materially (i) delay, prevent or hinder the consummation of the transactions contemplated by this Agreement or (ii) increase the Seller's expenses incurred in connection with the transactions contemplated hereby.

(c)     The party with the primary legal obligation for the reporting and payment of any Transfer Taxes shall file any Tax Returns and other documentation that must be filed in connection with such Transfer Taxes, and shall use its reasonable best efforts to provide such Tax Returns to the other party at least ten (10) Business Days prior to the date such Tax Returns are due to be filed. If required by Applicable Law, the parties will, and will cause their respective Affiliates to, join in the execution of any such Tax Returns or other documentation.

(d)     On or before the Closing Date, the Seller shall deliver to Buyer a statement, signed under penalties of perjury and dated no more than thirty (30) days prior to the Closing Date, that satisfies the requirements of Treasury Regulation Section 1.1445-2(b)(2)

and confirms that the Seller is not a "foreign person" as defined in Section 1445 of the Code.

ARTICLE 9

EMPLOYEE MATTERS

Section 9.01.  *Representations and Warranties*.  Except as set forth in the Disclosure Schedule and subject to Section 12.13, the Seller represents and warrants to Buyer that:

(a) Schedule Section 9.01(a) sets forth a complete and accurate list of those employees of the Seller providing services to the Business as of February 23, 2018, including the work location and base wage rate or salary of such employees (the **"Business Employees"**). No collective bargaining agreement or other labor union contract is currently in effect with respect to the Business or any Business Employee and there is no collective bargaining agreement that could reasonably be expected to be relevant to the Business after Closing.

(b) Except as set forth on Schedule Section 9.01(b)(i), as of the date hereof, the Seller has no Knowledge of any union organizing activities or proceedings involving, or any pending petitions for recognition of, a labor union or association as the exclusive bargaining agent for, or where the purpose is to organize, any group or groups of Business Employees. Except as set forth on Schedule Section 9.01(b)(ii), as of the date hereof, the Seller has no Knowledge of any strikes, work stoppages, work slowdowns or lockouts nor of any threats thereof, by or with respect to the Business or any of the Business Employees.

(c) Except as set forth on Schedule Section 9.01(c), with respect to the Business, to the Knowledge of the Seller, there exists: (i) no charges or claims threatened or pending before a governmental administrative agency involving alleged violations of employment or labor-related laws, including but not limited to, any anti-discrimination law, wage payment law, labor relations laws or occupational safety and health law; and (ii) no threatened or pending litigation arising out of employment-related federal, state or local laws, including laws regarding discrimination, wage payments, labor relations or occupational safety and health.

(d) Except as set forth on Schedule Section 9.01(d), within the twelve (12) months prior to the date hereof, the Seller has not failed to comply with the requirements of the WARN Act in connection with any plant closing or mass layoff of individuals employed at or who primarily provided service to the Business. Except as set forth on Schedule Section 9.01(d), the Seller has not incurred any material liability under the WARN Act that remains unsatisfied as of the Closing Date. The Seller has heretofore made available to Buyer a true and complete list of layoffs, by location, implemented by the Seller in the 180-day period preceding the Closing Date at any location employing any individuals employed by the Business.

(e) Schedule Section 9.01(e) sets forth a complete list of all employee benefit plans, policies and practices (whether or not subject to ERISA) applicable to employees of the Seller, including, without limitation, plans, funds or programs providing medical,

surgical or hospital care or benefits; benefits in the event of sickness, accident, disability, death or unemployment; vacation benefits; apprenticeship or other training programs; day care centers; scholarship funds; prepaid legal services; benefits described in Section 302(c) of the Labor Management Relations Act; retirement income; income deferral for periods extending to the termination of covered employment or beyond; severance pay arrangements; and supplemental retirement income payments which take into account increases in the cost of living (referred to herein collectively as "**Plans**"). Each employee benefit plan, policy or practice which is funded through a policy of insurance is indicated by the word "insured" placed by the listing of the plan on Schedule Section 9.01(e). For purposes of this Section 9.01(e), the term "employee benefit plan(s)" shall have the meaning ascribed to it in Section 3(3) of ERISA, and the regulations promulgated thereunder, and the term "employee pension benefit plan(s)" shall have the meaning ascribed to it in Section 3(2) of ERISA.

(f) Each of the Seller's Plans has been executed, managed and administered in material compliance with all Applicable Law, including the applicable provisions of ERISA, the Code, and the regulations promulgated thereunder. The Seller has no Knowledge of any fact which would adversely affect the qualified status of any of the Plans, or of any threatened or pending claim against any of the Plans or their fiduciaries by any participant, beneficiary or Governmental Authority.

(g) The Seller has fully complied with the notice and continuation requirements of Parts 6 and 7 of Subtitle B of Title I of ERISA and Section 4980B of the Code, and the regulations thereunder, whether proposed or final.

(h) The Seller does not maintain, has never maintained and has never contributed to or had an obligation to contribute to any employee pension benefit plans subject to Title IV of ERISA or multi-employer plan as defined in Sections 3(37) and/or 4001(a)(3)(A) of ERISA.

(i) No Plan provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of the Seller for periods extending beyond their retirement, disability or other termination of service, other than coverage mandated by Applicable Law.

Section 9.02  *Employee Issues.*

(a) Upon the execution of this Agreement, Seller will provide to Buyer information about the Business Employees and an opportunity to interview the Business Employees. Buyer, as soon as reasonably practicable after the date hereof, but no later than five (5) Business Days prior to the Closing, shall provide the Seller with a list of those Business Employees to whom it desires to offer employment (whether through Buyer or one of its Affiliates) effective as of the Closing (such list may be updated from time to time by Buyer in consultation with and with the approval of the Seller, which approval shall not be unreasonably withheld, conditioned or delayed, until one (1) Business Days prior to the Closing) (the Business Employees so listed, the **"Offered Employees"**). On the day prior to the Closing Date, the Seller shall terminate the employment of each Offered Employee

and shall cooperate with, and use its commercially reasonable efforts to assist, Buyer with Buyer's hiring of such Offered Employees. Those Offered Employees who accept Buyer's offer of employment and commence working for Buyer on the Closing Date (or upon return to work within 14 days after the Closing Date from approved vacation or within 180 days after the Closing Date from approved leave (including disability leave)) shall hereafter be referred to as **"Hired Employees."** For the avoidance of doubt, the Seller shall retain all Liabilities, including severance or other termination costs, if any, including the offer of coverage under COBRA, relating to any employees of the Business or the Seller on or prior to the Closing Date.

(b) Buyer shall not assume any (i) "employee benefit plan" as defined in Section 3(3) of ERISA or (ii) other compensatory or health or welfare benefit Plan or agreement, in each case, that is sponsored, maintained or contributed to by the Seller for the benefit of any Business Employee, nor any liabilities associated with such Plans, including any obligations under COBRA for any employees or former employees of the Seller or its Affiliates.

(c) With respect to Hired Employees, Buyer and the Seller shall use the alternative procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(d) The Seller shall be solely responsible for all grievances, arbitrations, claims, demands, or charges of any nature whatsoever including, any such grievances, arbitrations, claims, demands, or charges whether now known or not yet made by any employees, bargaining agents, or governmental agencies, which result from or arise out of any event occurring prior to the Closing Date.

(e) The Seller shall be responsible for all Workers' Compensation Liabilities arising out of any occupational injury to any Business Employee occurring on or prior to the Closing and Buyer shall be responsible for all Workers' Compensation Liabilities arising out of any occupational injury to any Hired Employee occurring following the Closing.

(f) Nothing in this Section 9.02 is intended to require Buyer to continue employment for any period of time or on any specific terms or conditions of any Hired Employee after the Closing. Nothing contained in this Agreement shall be construed as an amendment or modification of any employee benefit plan of the Seller.

Section 9.03 *No Third Party Beneficiaries.* Without limiting the generality of Section 12.09, the provisions of this Article 9 are included for the sole benefit of the Seller and Buyer and nothing herein, whether express or implied, shall create any third party beneficiary or other rights in any other Person, including in any current or former employee, independent contractor or other service provider (including any beneficiary or dependent thereof) of the Seller in respect of continued employment (or resumed employment) with Buyer or any of its Affiliates or the Business and no provision of this Article 9 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Plans, or any plan or arrangement that may be established by Buyer or any of its Affiliates. No provision of this

Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of the Seller, Buyer or any of their respective Affiliates.

ARTICLE 10
CONDITIONS TO CLOSING

Section 10.01.   *Conditions to Obligations of Buyer and the Seller*.   The obligations of Buyer and the Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    The Sale Order shall have been entered by March 12, 2018, by the Bankruptcy Court, shall not be subject to a stay pending appeal, shall not have been modified or amended without the written consent of the parties and shall not have been reversed or vacated; provided, that the foregoing condition as it applies to the absence of any appeal may be waived by Buyer without the consent of the Seller.

(b)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order, writ, judgment, injunction, decree stipulation, determination or award which is in effect and has the effect of making any of the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of the transactions contemplated by this Agreement or causing any of the transactions contemplated by this Agreement to be rescinded following completion thereof or delaying the consummation of the transactions contemplated by this Agreement beyond the End Date; and

(c)    The Seller and Buyer shall have agreed upon and attached final Exhibits to this Agreement on or before two (2) business days.

Section 10.02.   *Conditions to Obligation of Buyer*.   The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)    The Seller and its Affiliates shall have performed or complied with, in each case, in all material respects all of their covenants, agreements and obligations hereunder required to be performed by them on or prior to the Closing Date.

(b)    The representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects on the date hereof and at and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(c)    Since the date of the Agreement, there shall not have occurred any Material Adverse Effect (or any development that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect).

(d)    The objection deadline shall have passed for all counterparties to Assumed Contracts and Assumed Leases to object to the Cure Costs contained in their respective Cure Notice; provided that such objection deadline shall be no less than seven (7) days after such Cure Notice is served on each such counterparty.

49

(e)     Arrangements satisfactory to Buyer shall be in place regarding the regulatory bonding and security arrangements required in connection with the transfer of Transferred Permits as contemplated herein.

(f)     At least 90% of those Business Employees of the Seller who are provided with offers of employment by Buyer pursuant to Section 9.02(a) (with compensation substantially similar to, or better than, such employees' compensation from the Seller) accept such offers of employment, contingent upon Buyer being the successful purchaser of the Purchased Assets upon entry of the Sale Order.

(g)     Buyer shall have reached an agreement with CN Crag Lovett LLC regarding that certain Lease Agreement dated May 21, 2007, between CN Crag Lovett LLC, as landlord, and the Seller, as tenant and successor in interest to MSI Equipment Centers, Inc., as amended or otherwise modified from time to time, including by that certain First Amendment of Lease Agreement dated as of January 31, 2010, pursuant to a new lease with terms that are consistent with a term sheet that has been circulated.

(h)     Reserved.

(i)     The Seller shall have completed and delivered to Buyer (i) a complete draft of the Disclosure Schedule to this Agreement on or before January 31, 2018, and (ii) a final Disclosure Schedule satisfactory to Buyer in its sole and absolute discretion on or before February 15, 2018;

(j)     The Buyer shall have agreed to or otherwise reached an agreement on the payment and amount of all Cure Costs related to all Assumed Contracts and Assumed Leases, and counter parties thereto.

(k)     Seller shall have delivered the following to Buyer:

(i)     a certificate, dated as of the Closing Date, executed by an authorized officer of the Company to the effect that the conditions set forth in Section 10.02(a), Section 10.02(b), Section 10.02(c) and Section 10.02(d) have been satisfied;

(ii)     the Bill of Sale and Assignment and Assumption Agreement, duly executed by Seller;

(iii)     a certificate of the secretary of Seller certifying to (A) the Articles of Incorporation, as amended (or similar incorporation or formation documents), of Seller, certified by the Secretary of State of the jurisdiction in which Seller is incorporated or organized, as of a recent date, and stating that no amendments have been made to such certificate of incorporation (or similar incorporation or formation documents) since such date, (B) all other Governing Documents of Seller, (C) the adoption of resolutions by Seller approving the transactions contemplated by the Transaction Documents, and (D) the incumbency of the officers signing the Transaction Documents on behalf of Seller (together with their specimen signatures);

(iv)    a good standing certificate, as of a recent date, for Seller certified by the Secretary of State of (A) the state of organization of Seller and (B) each other jurisdiction in which Seller is qualified to do business as a foreign entity; and

(v)    the certificates contemplated by Section 8.01(d).

The foregoing conditions of this Section 10.02 are for the sole benefit of Buyer and may be waived by Buyer (except with respect to Section 10.02(d)), in whole or in part, at any time and from time to time in the sole discretion of Buyer. The failure by Buyer at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 10.03.    *Conditions to Obligation of the Seller*.  The obligation of the Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)  Buyer shall have performed or complied with, in each case, in all material respects all of its covenants, agreements and obligations hereunder required to be performed by it at or prior to the Closing Date.

(b)  The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on the date hereof and at and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(c)    Buyer shall have delivered the following to Seller:

(i)    a certificate, dated as of the Closing Date, executed by an authorized officer of the Company to the effect that the conditions set forth in Section 10.03(a) and Section 10.03(b) have been satisfied;

(ii)    the Bill of Sale and Assignment and Assumption Agreement, duly executed by Seller;

(iii)    a certificate of the secretary of Buyer certifying to (A) the Certificate of Formation, as amended (or similar incorporation or formation documents), of Buyer, certified by the Secretary of State of the jurisdiction in which Buyer is formed or organized, as of a recent date, and stating that no amendments have been made to such certificate of formation (or similar formation documents) since such date, (B) all other Governing Documents of Buyer, (C) the adoption of resolutions by Buyer approving the transactions contemplated by the Transaction Documents, and (D) the incumbency of the officers signing the Transaction Documents on behalf of Buyer (together with their specimen signatures); and

(iv)    a good standing certificate, as of a recent date, for Buyer certified by the Secretary of State of the state of organization of Buyer.

The foregoing conditions of this Section 10.03 are for the sole benefit of the Seller and may be waived by the Seller, in whole or in part, at any time and from time to time in the sole discretion of the Seller. The failure by the Seller at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 10.04. *Frustration of Closing Conditions.*  No party may rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse such party's obligation to effect the Closing if such failure was caused by such party's breach of this Agreement.

ARTICLE 11
TERMINATION

Section 11.01. *Grounds for Termination.*  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Seller and Buyer;

(b)    by either the Seller or Buyer if the Closing shall not have been consummated on or before April 6, 2018 (the "**End Date**"); *provided*, however, that at the time of such termination, the party seeking to terminate shall not be in material breach of its obligations under, or any representation or warranty made in, this Agreement, such that any condition to Closing of the other party would not be satisfied, including such first party's obligation to consummate the Closing on the terms and subject to the conditions set forth herein;

(c)    by either the Seller or Buyer if consummation of the transactions contemplated hereby would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(d)    by Buyer if a material breach of (i) any representation or warranty of the Seller set forth in Section 3.05, Section 3.06, Section 3.07, Section 3.08, Section 3.10, Section 3.12, Section 3.13 or Section 3.21 of this Agreement shall have occurred, (ii) any other representation or warranty of the Seller set forth in this Agreement that would reasonably be expected to cause a Material Adverse Effect shall have occurred, or (iii) any covenant of the Seller set forth in this Agreement shall have occurred; *provided*, that at the time of such termination, Buyer shall not be in material breach of its obligations under this Agreement;

(e)    by Buyer or the Seller if an order is entered by any Governmental Authority with jurisdiction over the subject matter holding that Buyer may not, pursuant to Section 363(k) of the Bankruptcy Code, credit bid in payment of the applicable portion of the Purchase Price or otherwise effect the Credit Release;

(f)    by Buyer or the Seller upon the dismissal of the Bankruptcy Case;

(g)    by Buyer or the Seller (i) if, at the end of the auction contemplated by the Bidding Procedures, Buyer's bid is not determined to be the Successful Bid (as defined in the Bidding Procedures) with respect to the Purchased Assets, or (ii) upon the

52

consummation of any other Alternative Transaction effected by the Seller in a manner consistent with the Bidding Procedures;

(h)    by Buyer or the Seller if a court of competent jurisdiction or other Governmental Authority has issued an order or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the Closing and such order or action has become final and non-appealable.

The party desiring to terminate this Agreement pursuant to Section 11.01 shall give notice of such termination to the other party.

ARTICLE 12
MISCELLANEOUS

Section 12.01. *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission) and shall be given,

if to Buyer, to:

> AZZ Enclosure Systems – Chattanooga LLC
> 3100 W. 7th Street
> Forth Worth, TX 76107
> Attn: Tara D. Mackey
> Email: taramackey@azz.com

and:

> AZZ Enclosure Systems – Chattanooga LLC
> 3100 W. 7th Street
> Fort Worth, TX 76107
> Attn: Ken Lavelle
> Email: kenlavelle@azz.com

with a copy (which shall not constitute notice) to:

> Akerman LLP
> 2001 Ross Avenue, Suite 3600
> Dallas, Texas 75201
> Attn:  John E. Mitchell
> Attn:  Scott Lawrence
> Email: john.mitchell@akerman.com
> Email: scott.lawrence@akerman.com

> Akerman LLP
> 601 West Fifth St., Suite 300
> Los Angeles, CA 90071

Attn:  Jose Manalo
Email: jose.manalo@akerman.com

if to the Seller, to:

Lectrus Corporation
1919 W. Polymer Drive
Chattanooga, TN 37421
Attn: Jim Beers
E-mail: jbeers@lectrus.com

with a copy (which shall not constitute notice) to:

Baker Donelson, P.C.
633 Chestnut Street, Suite 1900
Chattanooga, TN 37450
Attn: Justin M. Sveadas
Email: jsveades@bakerdonelson.com

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto.  All notices and other communications given in accordance with the provisions of this Agreement shall be deemed to have been given and received when delivered by hand or transmitted by facsimile (with confirmation of transmission) or email, three Business Days after the same are sent by certified or registered mail, postage prepaid, return receipt requested or one Business Day after the same are sent by a reliable overnight courier service, with acknowledgement of receipt.

Section 12.02.  *Survival*.  All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificates delivered hereunder, shall not survive the Closing, except for the Closing and pre-Closing covenants and obligations with respect to (x) the obligations of the Seller to transfer, or to bring about the transfer, to Buyer of title to, and ownership of, the Purchased Assets and the obligation of Buyer to assume the Assumed Liabilities and (y) the Excluded Liabilities and Excluded Assets.

Section 12.03.  *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective; provided, however, that any waiver, consent or amendment that adversely affects the Seller or the Pre-Petition Lenders or Buyer or waives or modifies any of the conditions to the Seller's obligations to consummate the Closing set forth in Section 10.01

or Section 10.03 shall not be effective without the written consent of the Pre-Petition Lenders or Buyer.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.04.  *Expenses*.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

Section 12.05.  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto. Notwithstanding the foregoing sentence Buyer shall have the right to assign to any one or more of its Affiliates any of its rights or obligations under this Agreement, the Transaction Documents or any other document or instrument, in whole or in part; provided that no assignment hereunder shall relieve Buyer of its obligations under this Agreement, the Transaction Documents or any other such document or instrument and Buyer shall cause such assignees to perform such obligations on behalf of Buyer in accordance with the terms of this Agreement, the Transaction Documents or such other document or instrument, as applicable.

Section 12.06.  *Governing Law*.  This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by and construed in accordance with the law of the State of Tennessee without regard to the conflicts of law rules of such state.

Section 12.07.  *Jurisdiction*.  To the fullest extent permitted by Applicable Law, the parties hereto (a) agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby shall be brought (i) in the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Case and (ii) in either the Circuit Court of Hamilton County, Tennessee or the United States District Court for the Eastern District of Tennessee (the "**Tennessee Courts**"), if brought after entry of such final decree closing the Bankruptcy Case, and shall not be brought, in each case, in any other state or federal court in the United States, (b) agree to submit to the exclusive jurisdiction of the Bankruptcy Court or the Tennessee Courts, as applicable, pursuant to the preceding clauses (a)(i) and (a)(ii), for purposes of all suits, actions or proceedings arising out of, or in connection with this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby, (c) waive and agree not to assert any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the

foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

Section 12.08.  *WAIVER OF JURY TRIAL.*  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 12.09.  *Counterparts; Effectiveness; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Subject to entry of the Sale Order, this Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 12.10.  *Entire Agreement*.  This Agreement and the Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement and the Transaction Documents.

Section 12.11.  *Bulk Sales Laws*.  Buyer and the Seller each hereby waive compliance by the Seller with the provisions of the "bulk sales," "bulk transfer" or similar laws of any state.

Section 12.12.  *Severability.*  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.13.  *Disclosure Schedules*.  The Seller and Buyer, as applicable, have set forth information on the Disclosure Schedule in a section thereof that corresponds to the section of this Agreement to which it relates. The parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer or the Seller, as applicable, and (ii) the disclosure by the Seller or Buyer, as applicable, of any matter in the Schedules shall not be deemed to constitute an acknowledgment by the Seller or Buyer, as applicable, that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

**Execution Version**

Section 12.14. *Specific Performance.*  The parties acknowledge and agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur if the parties do not perform any provision of this Agreement in accordance with the terms hereof, or otherwise breach any such provision, and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each party agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**AZZ ENCLOSURE SYSTEMS –**
**CHATTANOOGA LLC**

By: _____

Name: Tara D. Mackey

Title: Secretary

**LECTRUS CORPORATION**

By: _____

Name: _Shaun M. Martin_____

Title: __Chief Restructuring Officer_____

**Execution Version**

# EXHIBIT A

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of **[●]**, between **AZZ ENCLOSURE SYSTEMS – CHATTANOOGA LLC**, a Delaware limited liability company, or its designees ("**Buyer**"), and **LECTRUS CORPORATION**, a Tennessee corporation (the "**Seller**").

## W I T N E S E T H :

WHEREAS, Buyer and the Seller have concurrently herewith consummated the purchase by Buyer of the Purchased Assets pursuant to the terms and conditions of the Asset Purchase Agreement dated as of **[●]** by and among Buyer and the Seller (the "**Asset Purchase Agreement**"; terms defined in the Asset Purchase Agreement and not otherwise defined herein being used herein as therein defined);

WHEREAS, pursuant to the Asset Purchase Agreement, Buyer has agreed to assume certain liabilities and obligations of the Seller with respect to the Purchased Assets and the Business;

NOW, THEREFORE, in consideration of the sale of the Purchased Assets and in accordance with the terms of the Asset Purchase Agreement, Buyer and Seller agree as follows:

1.    (a)    The Seller does hereby sell, transfer, assign and deliver to Buyer all of the right, title and interest of the Seller in, to and under the Purchased Assets; *provided* that no sale, transfer, assignment or delivery shall be made of any or any material portion of any Purchased Asset if an attempted sale, assignment, transfer or delivery, without the consent of a third party, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller thereunder (after giving effect to the Sale Order).

(b)    Buyer does hereby accept all the right, title and interest of the Seller in, to and under all of the Purchased Assets (except as aforesaid) and Buyer assumes and agrees to pay, perform and discharge promptly and fully when due all of the Assumed Liabilities and to perform all of the obligations of the Seller to be performed under the Assumed Contracts except to the extent liabilities thereunder constitute Excluded Liabilities.

2.    This Agreement shall be governed by and construed in accordance with the law of the State of Tennessee, without regard to the conflicts of law rules of such state.

3.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

4.    If there is any conflict between this Agreement and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

**Execution Version**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BUYER

By: _____

Name: _____

Title: _____

**Execution Version**

**LECTRUS CORPORATION**

By: _____

Name: _____

Title: _____